## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GODDARD SYSTEMS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 17-1003-CJB |
| | ) |
| HINA GONDAL, BILAL GONDAL, and | ) |
| BHSG & CO., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| ROBERT STELLA and | ) |
| THE GEM SCHOOL, INC., | ) |
| | ) |
| Intervenors. | ) |
| | ) |

Douglas E. McCann and Jeremy D. Anderson, FISH & RICHARDSON, P.C., Wilmington, Delaware; Dean T. Fournaris, John M. Doroghazi and Jacob A. Sand, WIGGIN AND DANA LLP, Philadelphia, Pennsylvania, Attorneys for Plaintiff.

Gary E. Junge, SCHMITTINGER & RODRIGUEZ, P.A., Newark, Delaware; Christopher P. Coval, FENNINGHAM, DEMPSTER & COVAL, LLP, Trevose, Pennsylvania, Attorneys for Defendants.

Melvyn I. Monzack and Michael C. Hochman, MONZACK MERSKY MCLAUGHLIN AND BROWDER, P.A., Wilmington, Delaware, Attorneys for Intervenors.

## MEMORANDUM OPINION

March 29, 2018
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

This case, which was filed by Plaintiff Goddard Systems, Inc. ("Plaintiff" or "GSI")

against Defendants Hina Gondal, Bilal Gondal, and BHSG & Co. ("Defendants"), relates to a

Franchise Agreement (the "FA" or "Franchise Agreement") previously entered into between

Plaintiff and Defendants. Pursuant to that FA, Plaintiff granted Defendants a preschool franchise

located in Middletown, Delaware (the "Middletown Goddard School"). In the instant action,

Plaintiff, *inter alia*, alleges that Defendants have breached various terms of the FA.

Presently before the Court is Plaintiff's Motion for Preliminary Injunction ("the motion").

(D.I. 8) With that motion, Plaintiff seeks to enjoin Defendants and any other persons "in active

concert or participation" with Defendants—including Intervenors Robert Stella and The Gem

School, Inc. ("The Gem School," and together with Mr. Stella, "Intervenors")—from taking

certain actions in the future. (D.I. 8-5) Having heard oral argument, having considered the

considerable amount of briefing and evidence presented by the parties, (*see, e.g.*, D.I. 8-2, D.I.

18, D.I. 20, D.I. 52, D.I. 53–55, D.I. 57–58), and for the reasons set forth below, the Court

DENIES Plaintiff's motion.

## I.     BACKGROUND

### A.     The Parties

#### 1.     Parties to the Litigation

GSI is a Pennsylvania corporation with its principal place of business in King of Prussia,

Pennsylvania. (D.I. 1 at 1 at ¶ 1) Mrs. Hina Gondal and Mr. Bilal Gondal (collectively, "the

Gondals") are a married couple who are residents of Middletown, Delaware. (*Id.* at 1–2 at

¶¶ 2–3) BHSG & Co. ("BHSG") is a Delaware corporation with its principal place of business in

Middletown, Delaware. (*Id.* at 2 at ¶ 4)

## 2.    Non-Party Intervenors

As noted above, the motion includes a request for injunctive relief that specifically names not just Defendants, but also Mr. Stella and The Gem School. (D.I. 8-5) Mr. Stella is a resident of Delaware, and is a real estate developer. (D.I. 53, ex. A (hereinafter, "Tr.") at 94, 162-63) The Gem School is owned by Mr. Stella; it is located in Middletown, Delaware and is run out of the former location of the Middletown Goddard School. (D.I. 18-2, ex. 3, D.I. 40 at 1; Tr. at 129)[1]

## B.    Procedural Background

Plaintiff filed a Complaint against Defendants in the United States District Court for the Eastern District of Pennsylvania on May 5, 2017. (D.I. 1) The Complaint contained nine counts, each brought against all three Defendants: (1) a claim of trademark infringement and unfair competition (Count I); (2) a breach of contract claim based on the violation of a post-term covenant not to compete in the FA (Count II); (3) a breach of contract claim based on the violation of the in-term covenant not to compete in the FA (together with the post-term covenant not to compete, the "covenants not to compete") (Count III); (4) a breach of contract claim based on the violation of a confidentiality provision (the "confidentiality provision") in the FA (Count IV); (5) a breach of contract claim based on the violation of various other provisions of the FA (Count V); (6) a breach of contract claim based on the premature and wrongful termination of the FA and associated lost future royalties (Count VI); (7) a breach of the covenant of good faith and

---

[1]    Mr. Stella is and has been the owner of The Gem School since its was formed; in mid-2017, a partner, Steven Coleman, took on a 10% interest in the school, leaving Mr. Stella as the primary owner (with a 90% interest) of the school. (D.I. 18-2, ex. 3; D.I. 20-2, ex. A; Tr. at 129) Mr. Stella also owns another childcare center located in Wilmington, Delaware. (D.I. 18-1 at ¶ 20)

2

fair dealing (Count VII); (8) a misappropriation of trade secrets claim (Count VIII); and (9) a claim for specific performance (Count IX). (D.I. 1 at 22–33 at ¶¶ 43–102)

On May 22, 2017, Plaintiff filed the instant motion, (D.I. 8), and briefing on the motion was complete on June 23, 2017, (D.I. 20). The initial round of briefing on the motion did not include Intervenors, as they had not yet moved to intervene in the case. (D.I. 8-2; D.I. 18; D.I. 20)

The case was subsequently transferred to the United States District Court for the District of Delaware on July 24, 2017, (D.I. 26), and was initially assigned to the Court thereafter. On September 1, 2017, Intervenors moved to intervene in this proceeding, and the Court granted that unopposed motion on September 8, 2017. (D.I. 40) On September 20, 2017, the parties filed a Notice, Consent, and Reference of a Civil Action to a Magistrate Judge, in which they consented to the Court conducting all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 48) The District Court ordered that this consent was effective as of September 21, 2017. (D.I. 49)

The Court scheduled an evidentiary hearing on the motion, which was held on September 15, 2017. The parties and the Intervenors participated in the hearing. On September 19, 2017, the Court set a post-hearing briefing schedule—it called for Plaintiff to file a post-hearing opening brief, Defendants and Intervenors to separately file post-hearing answering briefs, and Plaintiff to file a post-hearing reply brief. Plaintiff filed a post-hearing opening brief on October 2, 2017, (D.I. 52), and Defendants and Intervenors each filed post-hearing answering briefs on October 11 and 12, 2017, respectively, (D.I. 53–54). Then, without leave of Court, on October 12, 2017, Plaintiff filed a supplemental post-hearing opening brief; that brief referenced

3

additional, new evidence purportedly supporting Plaintiff's motion—evidence relating to

Intervenors' recent alleged use of Plaintiff's trademarks. (D.I. 55) Intervenors, also without

leave of Court, then filed a response to that supplemental post-hearing opening brief on October

17, 2017. (D.I. 57) Lastly, Plaintiff filed its post-hearing reply brief on October 18, 2017, (D.I.

58), such that post-hearing briefing was completed on that date.

### C.     Facts Relevant to Resolution of the Motion

#### 1.     Goddard School Franchises, the Opening of the Middletown Goddard School and the Gondals' Agreements with GSI

GSI is the franchisor of THE GODDARD SCHOOL® businesses ("Goddard School(s)"),

which specialize in offering to the public preschool early education programs for children. (D.I.

1 at 4 at ¶ 15) GSI enters into a business relationship with its franchisees, which enables each

franchisee to operate one or more individual Goddard Schools. (*Id.* at 6 at ¶ 25) The business

relationship between GSI and its franchisees is governed by the terms and conditions of a

franchise agreement (like the FA, here). (*Id.*) As of the date of the filing of the instant motion,

there were approximately 465 Goddard School franchisees nationwide, and four such schools

operating in the State of Delaware. (D.I. 8-3 at ¶ 3)

In 2007, Mr. Gondal opened the Middletown Goddard School. (D.I. 18-1 at ¶ 2; Tr. at

170) Mr. Gondal's purchase of the franchise for the Middletown Goddard School is documented

in the FA, which was executed by Mr. Gondal and GSI on July 11, 2007. (D.I. 1-1, ex. 1 at 1;

D.I. 1 at 8 at ¶ 33) In December 2010, by way of an addendum to the FA, Mrs. Gondal "was

added to the Franchise Agreement as a franchisee[.]" (D.I. 1 at 8 at ¶ 34; *see also* D.I. 1-1, ex. 2)

The original term of the FA was 15 years. (D.I. 1-1, ex. 1 at ¶ 2(A))

4

The Gondals operated the school through several corporate entities. For example, in July 2013, the Gondals assigned their rights and obligations under the FA to BHSG, which was then owned and controlled by both Mr. Gondal and Mrs. Gondal. (D.I. 1 at 8 at ¶ 35; D.I. 1-1, ex. 3 at 1) Pursuant to that assignment agreement, the Gondals agreed to guarantee BHSG's performance "of its obligations under the Franchise Agreement and to continue to be bound by all of the provisions of the Franchise Agreement." (D.I. 1-1, ex. 3 at 1)

In January 2016, Mr. Gondal transferred all of his interests in BHSG to Mrs. Gondal, who, Plaintiff asserts, presently owns "all of the shares of BHSG." (D.I. 1 at 8 at ¶ 36; *see also* D.I. 8-3 at ¶ 24) At that time, "[Mr.] Gondal was removed from the Franchise Agreement and instead executed a Continuing Guaranty and Agreement to be Bound by Franchise Agreement . . . . and to personally guarantee BHSG's and [Mrs.] Gondal's full performance of all their duties and obligations under the Franchise Agreement." (D.I. 1 at 8-9 at ¶ 37; *see also* D.I. 1-1, ex. 4)

## 2. The School Building and Property

The Middletown Goddard School was located in a building at 100 Patriot Drive, Middletown, Delaware (the "school building"). Mr. Stella owned the property on which the school building sat, and he had constructed the school building in or around 2006 so that it could be leased to the Gondals for use as a Goddard School. (Tr. at 94-95, 170-71; D.I. 54, ex. C at 20; D.I 56, ex. 10 (July 2006 lease for the school building)) It was one of two buildings that Mr. Stella owned that housed Goddard Schools. (D.I. 54, ex. C at 27)

Mr. Stella (through a Delaware LLC known as VCII Ventures, LLC) entered into a lease agreement ("the lease agreement") with the Gondals (through a Pennsylvania corporation controlled by the Gondals known as Exquisite, Inc.), by which the Gondals leased the school

5

building. (D.I. 56, ex. 10; Tr. at 96-97) Under the terms of the lease, the Gondals had an option to purchase the building. (D.I. 56, ex. 10 at 19; Tr. at 96-97) According to Mr. Stella, this right to purchase was included in the lease agreement at least in part because GSI liked for its franchisees to have a right to purchase the schools that they run. (D.I. 54, ex. C at 27)

Starting in 2006, the Gondals paid rent for the school building, pursuant to this lease. (Tr. at 96) These lease payments continued for approximately 11 years. (*Id.*) Beginning in February 2009 and continuing through 2012, however, Mr. Gondal and Mr. Stella entered into a series of eight lease modification agreements. (D.I. 56, ex. 10) In those lease modification agreements, it was agreed that Mr. Gondal would a pay rent for the school building at a reduced rate (as compared to the rate called for by the lease agreement for that time period). (*Id.*) In certain of the modification agreements, it was also agreed that: (1) Mr. Gondal would repay certain of the amounts of the overall discounted rent in future lease years or in other ways; and (2) Mr. Gondal also agreed to provide Mr. Stella with monthly enrollment figures for the school. (*Id.*) According to Mr. Stella, he agreed to these rent discounts because Mr. Gondal "was struggling getting [the Middletown Goddard School] started . . . . [and] every summer [the school would] get very slow[.]" (D.I. 54, ex. C at 24-25) Mr. Stella testified that "in the even[t] that the Gondals were to exercise their option [to purchase the school building,] . . . these [discounted back rent] monies would be owed." (Tr. at 126-27)

The Gondals told Mr. Stella of their intent to exercise their option to purchase the school building in late 2015. (Tr. at 96-97, D.I. 54, ex. C at 28) On March 4, 2016, Mrs. Gondal—through a Delaware LLC that she controls known as Yellow Grass Investments, LLC ("Yellow Grass")—purchased the school building and property on which it sits from Bluegrass

6

Investments, LLC ("Bluegrass"), a Delaware LLC for which Mr. Stella is the Managing Member. (D.I. 8-3, ex. F at PageID#: 216-18[2]; D.I. 56, ex. 14 at 1; Tr. at 220) The contract sales price for the purchase was $2,250,000. (D.I. 56, ex. 14 at 1) In order to finance this purchase, Yellow Grass obtained a mortgage for $2,133,100 from Bank of America, N.A, which was secured by the school building/property and the Gondals' home. (D.I. 8-3, ex. F at PageID# 219–20, 238; Tr. at 121; D.I. 52, ex. B at 171)

That same day, March 4, 2016, Mr. Stella's lending arm, FCS Lending LLC entered into a loan agreement in the amount of $425,000 with Yellow Grass and the Gondals.[3] (D.I. 56, exs. 11–13; Tr. at 98-99, 121) The terms of this loan agreement required Yellow Grass and the Gondals to make payments totaling just over $6,000 per month, for approximately seven years. (Tr. at 128-29) According to Mr. Stella, this loan agreement was not related to the Gondals' purchase of the school building/property. (Tr. at 121-28) Instead, the loan amount in question actually represented monies that the Gondals already owed Mr. Stella as a result of their prior business dealings (including monies representing the discounted rent payments described in the aforementioned lease modification agreements). (*Id.*) The Gondals paid regularly on this loan until May or June of 2017, at which point they stopped paying on the debt. (Tr. at 145-47)

---

[2]     Not all pages of certain exhibits, including D.I. 8-3, ex. F, have page numbers. Herein, where this occurs, the Court will cite to the CM/ECF "PageID" numbers for the document.

[3]     This loan is a "purchase money mortgage" as defined by Delaware statute, (D.I. 56, ex. 13 at 14; Tr. at 124-26), and identifies three "Tax Parcel Nos." on its cover, (D.I. 56, ex. 13 at 1), but it does not otherwise describe the properties that secure the mortgage. Mr. Stella testified that the loan/mortgage was not recorded until August 2, 2017. (Tr. at 124) However, the copy of the loan/mortgage document that was admitted as an exhibit at the evidentiary hearing does not reflect that recordation date. (D.I. 56, ex. 13)

7

### 3.    Quality Assurance Reviews

In its Complaint, GSI states that in order to maintain the reputation and goodwill associated with Goddard Schools, it is important that each franchisee maintain the highest standards of quality, appearance and service. (D.I. 1 at 5 at ¶ 22) To that end, GSI requires its franchisees to undergo certain "Quality Assurance [or "QA"] standards assessments[.]" (*Id.* at 14 at ¶ 54)

On November 20, 2014, the school failed the first of a series of such assessments. (*Id.*) The school failed two more QA assessments the following year on May 21, 2015 and October 8, 2015. (*Id.*) On June 10, 2016—just three months after Mrs. Gondal purchased the school building—the school failed its fourth consecutive QA review. (*Id.*) "As a result, on June 21, 2016, GSI sent [the Gondals] a Notice of Default [as to the FA, hereinafter the "June 21, 2016 Notice"] . . . for failure to comply with [these] four (4) consecutive GSI Quality Assurance standards assessments[.]" (*Id.*; *see also* D.I. 1-1, ex. 6) In the June 21, 2016 Notice, GSI asserted that in light of these failures (as well as certain other alleged failures to comply with the requirements of the FA), it had the ability, pursuant to paragraph 13(B) of the FA, to terminate that agreement. (D.I. 1-1, ex. 6 at 2) GSI explained that it might conduct additional unannounced visits to the school, and that if the Gondals did not take certain actions to cure these defaults in the meantime, GSI might thereafter terminate the FA. (*Id.*)

On September 26, 2016, GSI conducted another QA review of the school, "which resulted in another Quality Assurance failure, including a poor Health and Safety score of just 66.7%, well below a passing score of 85%." (D.I. 1 at 15 at ¶ 55) According to GSI, this amounted to a failure "to cure the defaults identified in the June 21, 2016 Notice." (*Id.*)

8

### 4. Franchise Termination and Related Events

#### a. The Conditional FA and Second Conditional FA

On October 10, 2016, GSI notified Defendants that it was terminating the FA, in light of the Gondals' failure to address the issues raised in the June 21, 2016 Notice and the fact that the school did not pass the September 26, 2016 QA review. (D.I. 1-2, ex. 7) Thereafter, on October 28, 2016, the Gondals signed a "Listing Agreement" with GSI, in which the Gondals offered to sell the school and the associated franchise for $850,000. (*Id.*, ex. 8)

The parties then had further discussions, and on November 16, 2016, GSI, the Gondals and BSHG entered into a Conditional Reinstatement of the Franchise Agreement (the "Conditional FA"). (*Id.*, ex. 9) By its terms, the Conditional FA states that its "sole purpose" is to allow the Gondals to "transfer their business to an unrelated third party approved by GSI." (*Id.* at 3–4; *see also* Tr. at 19) The Conditional FA states that the FA would be conditionally reinstated until February 28, 2017, and that if the Gondals wished to transfer the business to a third-party approved by GSI, they would have to do so within the conditional reinstatement period. (D.I. 1-2, ex. 9 at 4) The Conditional FA contains no right or promise that GSI would later enter into a "full" or non-conditional reinstatement of the FA, and it states that if the Gondals/BSHG did not complete transfer of the business within the reinstatement period, then after notice from GSI, the parties would work to close the school. (*Id.* at 5; Tr. at 19) Despite this, in an affidavit he filed prior to the evidentiary hearing, Mr. Gondal asserted that "in order to induce us to sign the [Conditional FA, GSI] led us to believe that our franchise would be

9

reinstated upon the curing of the alleged 'quality assurance' deficiencies." (D.I. 18-1 at ¶ 9)[4]

After the parties entered into the Conditional FA, GSI thereafter sent a representative to work with the Gondals on improving their QA scores. (Tr. at 184)

The Conditional FA in fact expired on February 28, 2017. (Tr. at 16, 186) Nevertheless, in March and April 2017, the Gondals continued operating the school as a Goddard School, and continued to pay royalties to GSI. (*Id.*; D.I. 8-3 at ¶ 41) On March 27, 2017, GSI issued a "Certificate of Compliance" to the school, which stated that the school had "successfully fulfilled the standards, systems and procedures necessary for Quality Assurance Certification by [GSI] as of the date of this certificate." (D.I. 18-1, ex. 1)

Next, on or about April 4, 2017, GSI sent the Gondals a second proposed Conditional Reinstatement of the FA (the "Second Conditional FA"). (D.I. 1 at 17 at ¶ 61) However, in the interim, Mr. Gondal had discussions with a GSI executive, and learned that GSI would not fully reinstate the FA. (Tr. at 192) Thereafter, the Gondals refused to sign the Second Conditional FA. (*Id.* at 16, 192; D.I. 8-3 at ¶ 43)

### b. The Gem School's Formation

At some point in March or April 2017, Mr. Gondal approached Mr. Stella and informed him that Goddard was "yanking his franchise agreement and [Mr. Gondal] could no longer operate [the school]." (D.I. 52, ex. C at 96; *see also* Tr. at 100–101, 141, 192) Mr. Stella viewed the possible closure of the Middletown Goddard School as a problem, because it would threaten

---

[4]     Mr. Gondal did not expound much on this allegation during his testimony at the preliminary injunction hearing. Instead, he said only that he and his wife met with two of Plaintiff's representatives and was "under the impression that [Plaintiff was] going to give us a six month of – three months of reinstatement process." (Tr. at 183-84)

10

the Gondals' ability to repay the existing debt they owed to him; as a result, it was agreed that Mr. Stella would take over the school in order to further secure the Gondals' debt. (Tr. at 100–02, 141–42) Mr. Stella did not, either at this time or thereafter, pay the Gondals any money in order to take over the school's assets. (Tr. at 143, 211) And Mr. Stella did not give the Gondals any immediate "credit" against their existing debt in return for allowing Mr. Stella to take over the school. (Tr. at 144) Instead, Mr. Stella testified that in light of that existing debt,[5] if he were to later sell the school or otherwise obtain profits due to the school, such monies would then be applied to the Gondals' debt to him. (*Id.*; *see also* D.I. 52, ex. C at 89)[6]

On April 1, 2017, Mr. Stella incorporated The Gem School. (D.I. 18-2, ex. 3) The Gem School filed for a tax number with the IRS on April 5, 2017. (D.I. 18-2, ex. 4)

### c.   Mr. Gondal Provides Support to The Gem School Before The Gem School Opens

During the month of April 2017, Mr. Gondal (and to a lesser extent, Mrs. Gondal, via Yellow Grass) performed a variety of tasks in order to help The Gem School to be prepared to open its doors to students.

---

[5]     The Gondals, as noted above, stopped making loan payments on their debt to Mr. Stella by May or June 2017, (Tr. at 146), not long after the Middletown Goddard School closed. But Mr. Stella said that this was "natural[]" and that by that point there was "no reason for [the Gondals] to pay [him,]" in light of the fact that he "took over the business in the payment of [the] debt[,]" (D.I. 52, ex. C at 89).

[6]     As of the evidentiary hearing, Mr. Stella testified that he had not yet applied any credit to the Gondals debt to him in light of having taken over the school; in part, he explained this was due to the fact that the school had cost him $80,000–90,000 since he took it over. (Tr. at 144)

11

For example, Mr. Gondal contacted his accountant and asked her to help set up The Gem School as a corporate entity. (Tr. at 215) It was this accountant who helped Mr. Stella incorporate The Gem School. (*Id.*)

Additionally, on April 11, 2017, Mr. Gondal filed papers with the State of Delaware's Department of Services for Children, Youth and their Families' Office of Child Care Licensing ("OCCL"), in order to obtain a child care license from that agency (hereinafter, the "license") for The Gem School. (D.I. 8-3, ex. B; Tr. at 194–95)[7] Mr. Gondal filed a Renewal/Relocation License Application ("renewal application") and did so listing himself as the "applicant"; in the application, he listed Mr. Stella as the President of The Gem School and himself as "Consultant/V.P." (D.I. 8-3, ex. B at 2) According to the wording on the renewal application, by listing himself as the applicant, Mr. Gondal was stating to OCCL that he was to be an owner of The Gem School. (*Id.*, ex. B at 1; *id.*, ex. C at 1) In this application, Mr. Gondal indicated that he would be on site at the new school and would have access to children there, while Mr. Stella would not be on site. (*Id.*) Mr. Gondal explained that the reason he filed a renewal application and listed himself as the "applicant" (while noting Mr. Stella's association with The Gem School elsewhere on the application)—as opposed to having Mr. Stella submit an application listing himself as the "applicant"—was because Mr. Gondal understood that doing the former would allow the school to remain open during its transition from the Middletown Goddard School to The Gem School, while doing the latter would require that the school close for two or three months while Mr. Stella's application was reviewed and assessed. (Tr. at 195, 212-13; *see also*

---

[7]     The State of Delaware requires that a childcare facility in the State must have such a license in order to operate. (Tr. at 120; D.I. 8-3 at ¶ 49)

12

D.I. 8-3, ex. C at 2–3) The OCCL ultimately accepted the renewal application and added Mr. Stella to the license. (D.I. 8-3, ex. C at 1; *see also* D.I. 8-2 at 11)

Next, on April 25, 2017, The Gem School leased the property on which the school building is located (at 100 Patriot Drive in Middletown) from Yellow Grass. (D.I. 18-1 at ¶ 17; D.I. 18-2, ex. 5) The lease term was 25 years, to begin on the date that a certificate of occupancy issued for operation of The Gem School. (D.I. 18-2, ex. 5 at PageID# 360) For the first five years, the lease called for The Gem School to make rent payments to Yellow Grass of $14,000 per month, due in advance on the first day of each month. (*Id.* at PageID# 366; Tr. at 157) Mrs. Gondal signed the lease on behalf of Yellow Grass. (D.I. 18-2, ex. 5 at PageID#365)

Additionally, on or around April 28, 2017, Mr. Gondal contacted his insurance vendor, Specht Insurance Group, Ltd. ("Specht"), an entity that was then providing insurance for the Middletown Goddard School. (D.I. 8-3, ex. I; D.I. 53, ex. B at 271) Mr. Gondal informed the Specht representative that he was cancelling his insurance as of May 1, but he also asked if the insurance company would be "interested in quoting the new operation" (i.e., The Gem School); Mr. Gondal stated that this new school would "be the same kids, same everything that he had with Goddard." (D.I. 8-3, ex. I; *see also* D.I. 53, ex. B at 272) In this conversation, Mr. Gondal also indicated that he had already received a quote from a different insurance company for the new school. (D.I. 8-3, ex. I)

Lastly, in this same time frame, Mr. Gondal made some additional contacts on behalf of The Gem School. For example, he contacted other vendors, including his sign vendor and his tuition processor, on behalf of the school. (Tr. at 165, 215)

### d. Closing the Middletown Goddard School and the Opening of The Gem School

13

On April 28, 2017, Defendants' counsel sent Plaintiff a letter, notifying it that "the school is being shut down effective April 28, 2017." (D.I. 1, ex. 10) The letter further stated that "[a]ll of the proprietary items within [sic] the Goddard name are being removed.[8] Blue Grass Investments, LLC will be leasing this real property." (D.I. 1-2, ex. 10)

That same day, April 28, 2017, a letter was sent to all families with children attending the Middletown Goddard School (the "April 28 letter"). (D.I. 8-3, ex. H) That letter, which was signed "Sincerely, Management[,]" informed families that the Middletown Goddard School would no longer be operating "under the Goddard Franchise" as of April 30, 2017. (*Id.*) The letter continued:

> With great excitement, we would like to introduce you to **The GEM School**! Starting Monday May 1st, 2017, we will officially start operating under the new name. Please recognize that our staff, quality and curriculum will remain the same. The only major change will be our school name. Please ensure to write all checks out to The Gem School when paying your monthly tuition.
>
> On Monday May 1st, 2017 at 6:15 p.m. the Management team will be conducting a meeting to answer all questions and concerns.
>
> We are looking forward to the new and exciting adventures and we hope that you will continue to join as we advance.

(*Id.* (emphasis in original)) Mr. Gondal stated that he did not draft the April 28 letter, and that he did not review it before it was sent to customers of the Middletown Goddard School. (D.I. 53, ex. B at 268-69) According to Clarissa Patterson (an employee at the Middletown Goddard School who went on to serve as the Operations Manager at The Gem School), she drafted the letter along with a co-worker, Jessica Cioci (who was also an employee at the Middletown

---

[8]      On May 3, 2017, the Gondals shipped the proprietary Goddard operating manual to GSI. (Tr. at 172-73; D.I. 18-2, ex. 7)

Goddard School and who went on to serve as Education Director at The Gem School). (D.I. 53, ex. C at 41-42; D.I. 54, ex. H at 2) However, Ms. Patterson stated that while Mr. Gondal did not type the letter, Mr. Gondal did discuss with her what would be included in the letter, and he "looked [the letter] over" to help catch any typographical errors before it was sent out. (D.I. 53, ex. C at 41-42)[9]

Mr. Stella testified (and it is not disputed here) that: (1) the Middletown Goddard School in fact did close on Friday, April 28, 2017; and (2) on Monday, May 1, 2017, The Gem School opened in the same location. (D.I. 52, ex. C at 95; *see also* Tr. at 210) Mr. Stella also testified that, contemporaneous with the closing of the Middletown Goddard School, he had any Goddard School signage or trademarked materials removed from the school building and from a bus that was used to transport students to the school. (Tr. at 104–07; *see also id.* at 236; D.I. 18-1 at ¶ 33; D.I. 57, ex. C at ¶¶ 7–8)[10]

On Monday, May 1, 2017, The Gem School held a meeting for parents (the meeting referenced in the April 28 letter). (D.I. 53, ex. B at 270) At the meeting (the "May 1 meeting"), in addition to certain parents, were The Gem School's directors (Ms. Patterson, Ms. Cioci, and Amanda Phillips, who had worked as a lead teacher at the Middletown Goddard School and now serves as Marketing Manager at The Gem School) and Mr. Gondal. (Tr. at 224–25, 241; D.I. 52,

---

[9]     For his part, Mr. Stella also acknowledges that he "approved" the letter before it was sent. (Tr. at 154-55)

[10]    Mr. Stella did later acknowledge that the phrase "LEARNING FOR FUN. LEARNING FOR LIFE"—a phrase as to which Plaintiff has obtained federal trademark protection—remained on The Gem School's bus up through October 13, 2017. (D.I. 55, ex. 1; D.I. 57, ex. C at ¶¶ 9–12) He stated that after The Gem School opened, he had not realized that Plaintiff had protection for this mark; after he learned of this in a filing in the instant case, he immediately had the wording removed from the bus. (*Id.*)

15

ex. D at 45–46)[11] Mr. Gondal told parents that the school now was no longer a Goddard School and was "under the new company name." (D.I. 53, ex. B at 270; *see also* D.I. 52, ex. D at 46) He acknowledged that during the meeting "I don't think I mentioned that I'm the – you know, I'm not the owner [of The Gem School]." (D.I. 53, ex. B at 270) The directors then went on to tell the parents that while the name of the school was changing, the staff, the quality of care and how the students were to be taught would all remain the same. (*Id.*; D.I. 52, ex. D at 46-47)

With perhaps one or two exceptions, the same teachers who worked at the Middletown Goddard School continued to work at The Gem School. (Tr. at 152, 211) And The Gem School used the same equipment (e.g., chairs, toys, cribs, sheets) that had been previously used by the Middletown Goddard School (though there is no written document evidencing the transfer of the Middletown Goddard School's assets to The Gem School). (*Id.* at 152, 211-12) However, despite what was stated in the May 1 letter, the record does not clearly show that The Gem School used the Goddard School's curriculum to teach its students. Instead, the evidence reliably demonstrates only that, at some point after May 1, The Gem School employed two other curricula—Creative Curriculum and Teaching Strategies Gold. (Tr. at 237, 242)[12]

---

[11]    Mr. Stella did not attend the meeting. (Tr. at 156)

[12]    Plaintiff did present an affidavit from a private investigator who, on May 3, 2017, entered The Gem School and conversed with Ms. Patterson. (D.I. 8-4) According to the investigator, Ms. Patterson confirmed that "'the Goddard Method' [was] still being implemented, such as the 'F.L.EX.® Learning Plan[.]'" (*Id.* at ¶ 8) At the preliminary injunction hearing, however, Ms. Patterson denied even knowing what the "F.L.E.X. Learning Plan" is, and denied that The Gem School used any GSI curriculum after it opened. (Tr. at 235-37) Ms. Phillips testified similarly. (*Id.* at 247)

16

On May 4, 2017, GSI sent an e-mail ("the May 4 e-mail") from the Middletown Goddard School's e-mail account[13] to families with children who had attended the Middletown Goddard School. (D.I. 18-2, ex. 8) The e-mail, which bore a "Subject" line reading "Message from Goddard Systems, Inc.[,]" began as follows:

> It is with great sadness that Goddard Systems, Inc. (GSI), franchisor of The Goddard School, announces the closing of the Middletown, DE location. Unfortunately, we found out that the franchisee abruptly left the franchise system over the weekend. This was done without our knowledge or approval. We deeply regret the inconvenience this may be causing your family. Effective May 1, 2017, the building opened as GEM School, which is not affiliated with The Goddard School.

(*Id.*) The e-mail went on to provide parents with a list of other Goddard Schools in the area and of other childcare facilities in the area that had a "Delaware Star Program 5-star rating[.]" (*Id.*) In the time period thereafter, the number of students enrolled in The Gem School declined, as compared to the number of students who were enrolled in the Middletown Goddard School prior to its closure. (Tr. at 156) Since the transition, Plaintiff is not aware of any parents of The Gem School students who were confused into thinking that The Gem School was in some way affiliated with GSI. (*Id.* at 44)

At the time of the preliminary injunction hearing, 104 students attended The Gem School. (Tr. at 115, 243) Approximately 30 staff members worked at The Gem School as of that date. (*Id.* at 116, 243)

### e. Mr. Gondal's Continued Activity on Behalf of The Gem School After April 28, 2017

---

[13]     The e-mail address "MiddletownDE@goddardschools.com" is the address from which the e-mail was sent; this is apparently an e-mail account maintained by GSI. (D.I. 18-2, ex. 8)

17

After the Middletown Goddard School closed on April 28, 2017, Mr. Gondal remained involved with The Gem School for a period of time. This involvement came in three forms.

First, Mr. Gondal assisted The Gem School with its transition during the first two weeks of May 2017. (D.I. 18-1 at ¶ 30; Tr. at 214) The Gem School paid Mr. Gondal $500 for this work. (D.I. 54, ex. E at 37-38) Mr. Gondal testified that he was not expecting this payment and, when he noticed it in his bank account, he later contacted Mr. Stella to inquire as to what it was for. (*Id.*) Ultimately, Mr. Gondal testified that he kept this money, at least in part because Mr. Stella "owe[d] me" more money than this at the time. (*Id.*)

Second, Mr. Gondal continued to have involvement with The Gem School's licensure process. Mr. Gondal was asking Mr. Stella to take Mr. Gondal's name off of The Gem School's license during this time period. (Tr. at 216) In response to Mr. Stella's query as to whose name should go on the license, Mr. Gondal recommended that it be that of Ms. Phillips. (*Id.*) Mr. Gondal then asked Ms. Phillips to fill out a new license application for The Gem School in her name; Ms. Phillips submitted that application on May 16, 2017. (*Id.* at 216, 248-49; D.I. 18-2, ex. 6) Later, this May 16, 2017 application was withdrawn, and was supplanted by a new application that The Gem School filed on June 13, 2017. (D.I. 20-1 at ¶ 7 & ex. A) Ultimately, The Gem School was issued its own license by the OCCL on August 18, 2017; between May 2017 and the date that this license issued, Mr. Gondal provided some additional assistance with the licensing process (i.e., he answered certain of the OCCL's questions about the prior

Middletown Goddard School license, and he supplied certain documentation to The Gem School regarding that prior license). (Tr. at 150-51, 225-27)[14]

Third, Mr. Stella occasionally called Mr. Gondal after The Gem School opened to ask about procedures and operations used when the Middletown Goddard School was operating. (D.I. 52, ex. C at 123-24) Mr. Stella asked these questions "more so in the beginning" after The Gem School opened, as compared to the time period nearer to the preliminary injunction hearing. (*Id.*)

As of the date of the preliminary injunction hearing, the Gondals were no longer involved in the ownership or operation of The Gem School. (Tr. at 103, 196, 237; D.I. 18-1 at ¶ 30) Their two children continued to attend daycare at the school, and so the Gondals continue to pay tuition to the school and pick up and drop off their children at the school. (*Id.* at 174, 237; D.I. 54, ex. C at 136)

### f.    Defendants' Other Financial Transactions With The Gem School During the Summer of 2017

Additionally, the record contains evidence that the Gondals, BHSG, and The Gem School were financially intertwined during the summer of 2017. (D.I. 56, ex. 15 (Plaintiff's "Hearing Exhibit 15")) These entanglements relate to at least four different types of payments.

First, BHSG, the Gondals, and non-party Yellow Grass made payments to third parties between May 2017 and August 2017 that were for expenses related to "something at The Gem School, or on behalf of The Gem School or for an item at The Gem School or for a service

---

[14]    In the interval, from May 16, 2017 through August 18, 2017, The Gem School was operating under the license that was in Mr. Gondal's name. (Tr. at 150-51)

provided at The Gem School[.]" (Tr. at 217-18; *see also* Plaintiff's Hearing Exhibit 15) These payments totaled $14,927.23. (Plaintiff's Hearing Exhibit 15)

Second, the State of Delaware had continued to deposit purchase of care and STARS program tuition subsidy payments to BHSG from May 2017 through July 2017. (Plaintiff's Hearing Exhibit 15; Tr. at 162, 219-20; D.I. 54 at 8; *id.*, ex. E at 39-40) These payments totaled $35,022.52. (Plaintiff's Hearing Exhibit 15) Mr. Gondal testified that at least four of these payments—those made in June and July 2017 (totaling just under $24,000)—were payments that actually related to time periods when The Gem School was in operation (and the Middletown Goddard School was closed). (Tr. at 218-19; *see also* Tr. at 164-65) He stated that the payments were made to BHSG only because he and The Gem School had not yet completed the transfer of the school's license from the Gondals to someone associated with The Gem School. (*Id.* at 219).

Third (and relatedly), from June to August 2017, BHSG, Mrs. Gondal and Yellow Grass each made one payment apiece to Mr. Stella's loan servicer, FCS Lending LLC. (*Id.*) Mrs. Gondal also made a payment to one of Mr. Stella's employees in July 2017. (Plaintiff's Hearing Exhibit 15; Tr. at 159) The combined amount of these payments was $27,000. (Plaintiff's Hearing Exhibit 15) Mr. Stella indicated that these payments represented reimbursement for the monies referenced in the prior paragraph—subsidy payments from the State of Delaware made to accounts related to the Gondals, but that were in fact related to time periods when The Gem School was in operation. (Tr. at 160, 162-63) Thus, Mr. Stella explained that this $27,000 in payments was made by the Gondals to persons or entities associated with Mr. Stella, in order to transfer these State subsidy payments to their rightful location (i.e., to Mr. Stella and The Gem School). (Tr. at 162-63)

20

Fourth, in the months of June 2017 through August 2017, The Gem School paid rent for the school building to Yellow Grass, pursuant to the terms of the previously-referenced lease agreement. (*Id.* at 160-61, 200) These four payments (three of $15,000 and one of $12,000) totaled $57,000, and they appear to relate to rent payments for the months of June, July, August and September 2017. (*Id.*; D.I. 56, ex. 17)[15] It does not appear from the record that The Gem School paid Yellow Grass rent for the school building for the month of May 2017. (Plaintiff's Hearing Exhibit 15; D.I. 56, ex. 17; Tr. at 159)

## II.    STANDARD OF REVIEW

Preliminary injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (internal quotation marks and citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,[[16]] that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

---

[15]    Mr. Stella explained at the evidentiary hearing that certain of these payments were for $15,000—that is, $1,000 more than the $14,000 per month in rent owed to Yellow Grass—because they also took into account monies paid that were to be allocated for The Gem School's share of real estate taxes and real estate insurance. (Tr. at 160-61) However, Mr. Stella then appeared to confirm that, as of the date of the hearing, he had *not* paid any real estate taxes or real estate insurance to the Gondals. (*Id.* at 161-62)

[16]    "[T]he plaintiff . . . needs only to show a *likelihood* of success on the merits (that is, a reasonable chance, or probability, of winning) to be granted relief. A 'likelihood' does not mean more likely than not." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (emphasis in original).

21

"[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits . . . and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (footnotes omitted). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* In assessing the four preliminary injunction factors, a court should consider that "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* (citation and internal quotation marks omitted)).

The moving party "bears the burden of producing evidence sufficient to convince the court that [the preliminary injunction factors weigh in favor of granting an injunction.]" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

## III. DISCUSSION

### A. The Claims At Issue in the Motion

In this preliminary injunction process, Plaintiff presented the Court with an often-expanding (and sometimes shifting) set of claims on which it contends it will succeed on the merits. In its opening brief in support of the motion, for example, Plaintiff stated that it had a reasonable likelihood of success as to its claims that: (1) Defendants breached the FA's post-

22

term covenants not to compete; (2) Defendants breached the FA's confidentiality provision; and (3) Defendants infringed its trademarks. (D.I. 8-2 at 15-18, 24-25)

At the close of the preliminary injunction hearing, the Court noted that while Plaintiff had addressed a large number of possible claims in its pre-hearing briefing, during the hearing Plaintiff's counsel really seemed to be focusing on a smaller number of claims. (Tr. at 284) Thus, the Court urged Plaintiff, in its supplemental post-hearing briefs, to hone in on those claims where it "believe[s that it] ha[s the] strongest likelihood of success[,]" and on the evidence that would support such claims. (*Id.* at 284-85; *see also id.* at 257)

Despite the Court's suggestion, Plaintiff took a different approach in its supplemental briefing. At times, Plaintiff appeared to drop its arguments that certain claims merited an injunction, only to later revive those issues. In other instances, Plaintiff brought up new claims that it had not previously mentioned in its pre-hearing briefing. This inconsistent approach made for an unnecessarily complicated (and sometimes incomplete) record on the instant motion. And it certainly added significant time to the Court's decision-making process.

Below, the Court sets out each of the various claims Plaintiff has brought against Defendants as to which Plaintiff has asserted that it has a likelihood of success on the merits. The Court will then either: (1) determine whether Plaintiff has made the required showing as to such a claim; or (2) explain why Plaintiff has not done enough to fairly put such a claim at issue in these preliminary injunction proceedings.

**B.    Plaintiff's Likelihood of Success on the Merits as to Claims Brought Against Defendants**

**1.    Breach of Contract: The Covenants Not to Compete**

The Court first turns its attention to Plaintiff's claim for breach of contract based on the alleged violation of the FA's covenants not to compete, which are found in Section 16 of the FA.[17] (D.I. 8-2 at 15-23; D.I. 52 at 4-9; *see also* D.I. 1 at ¶¶ 55-59) Plaintiffs allegations as to the breach of these covenants make up the core of its argument as to why preliminary injunctive relief should be granted.

There are two covenants not to complete in Section 16—one in Section 16(B) covering acts taken "during the term of" the FA (which the Court has and will refer to herein as the "in-term" covenant not to compete) and one in Section 16(C) covering acts taken during a "period of 3 years after the expiration" of the FA (which the Court has and will refer to herein as the "post-term" covenant not to compete). (D.I. 1-1, ex 1 at § 16 ("Section 16")) Sections 16(B) and (C) of the FA read in full as follows:

> B. You covenant that during the term of this Agreement, except as otherwise approved in writing by us, you shall not directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or other entity:
>
> (1) Divert or attempt to divert any business or customer of the business franchised under this Agreement to any competitor, by direct or indirect inducement or otherwise, to do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System.
>
> (2) Employ or seek to employ any person who is at that time employed by us or by any of our franchisees, or otherwise directly or indirectly to induce such a person to leave his or her employment.

---

[17]     Defendants do not challenge the enforceability of the restrictive covenants in the FA, and so herein the Court will assume that they are valid and enforceable.

(3) Own, maintain, engage in, be employed by, finance, or have any interest in any other child daycare or preschool learning center or business.

C.  You covenant that for a period of 3 years after the expiration, transfer or termination of this Agreement, regardless of the cause of termination, or after the date upon which you cease to operate the School following the expiration, transfer or termination of this Agreement, whichever is later, you shall not either directly or indirectly, for yourself or through, on behalf of, or in conjunction with any other person, persons, partnership, corporation or other entity:

(1) Divert or attempt to divert any business or customer of the business franchised under this Agreement to any competitor, by direct or indirect inducement or otherwise, to do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System.

(2) Employ or seek to employ any person who is at that time employed by us or by any of our franchisees, or otherwise directly or indirectly to induce such a person to leave his or her employment; or

(3) Own, maintain, engage in, be employed by, finance, or have any interest in any child daycare or preschool learning center or business at the premises of the School or within a radius of 10 miles of the School or any existing or proposed School.

(*Id.*)

In its opening brief, Plaintiff focused exclusively on violations of Section 16(C)'s post-term covenant not to compete, (D.I. 8-2 at 15-18), though in its supplemental post-hearing opening brief, Plaintiff expanded its argument to include alleged violations of Section 16(B)'s in-term covenant not to compete, (D.I. 52 at 4-9).  As can be seen above, despite the temporal distinctions between Sections 16(B) and 16(C), the two provisions largely share common language.  For this reason, and in light of the nature of the alleged violations, below the Court

will largely refer to the covenants not to compete jointly, without making particular temporal distinction between Sections 16(B) and 16(C).[18]

Plaintiff has argued that it has a reasonable likelihood of success of showing that Defendants violated three different portions of the covenants not to compete. The Court will address each of the three portions in turn.

In doing so, pursuant to Pennsylvania law,[19] the Court will give the relevant words in these portions of the FA their ordinary meaning. *See Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) (citing *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 145 A.2d 672 (Pa. 1958)). Under Pennsylvania law, "[i]t is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982); *see also Kripp*, 849 A.2d at 1163. The

---

[18]    The parties have a dispute regarding the date on which the FA terminated. In its briefing, Plaintiff appears to assert that the FA terminated on April 28, 2017 (the date when Defendants' counsel sent Plaintiff the letter notifying it that the Middletown Goddard School was being shut down as of that day). This position appears to conflict a bit with a letter Plaintiff sent to Defendants on May 1, 2017, in which Plaintiff stated that the FA would terminate on the date upon which Defendants received that letter. (D.I. 1, ex. 13 at 3) For their part, Defendants take the position that the FA terminated on February 28, 2017 (the date when the Conditional FA expired). (D.I. 8-2 at 9)

The date on which the FA terminated would impact the Court's discussion regarding alleged violations of Sections 16(B) and 16(C)—in the sense that any violations prior to the termination date would be violations of Section 16(B) and any violations thereafter would be violations of Section 16(C). But because the parties did not address the termination date issue in any great detail in their briefing, and because the dispute does not appear to be dispositive as to any of the issues fairly raised by the instant motion, the Court will not definitively resolve it here.

[19]    The FA, pursuant to its terms, is to be construed under the laws of Pennsylvania (except to the extent governed by United States federal trademark law or other federal law). (D.I. 1-1, ex. 1 at § 23(A))

26

Court will also be mindful, however, that Pennsylvania law dictates that "because restrictive covenants are a partial restraint upon the free exercise of trade" they should be "strictly construed[.]" *Hayes v. Altman*, 266 A.2d 269, 271 (Pa. 1970); *see also Tantopia Franchising Co., LLC v. W. Coast Tans of PA, LLC*, 918 F. Supp. 2d 407, 415 (E.D. Pa. 2013); *Stone & Edwards Ins. Agency Inc. v. Stumpf*, 31 Pa. D & C. 4th 462, 469 (Pa. Com. Pl. 1996).

### a.     The "[d]ivert or attempt to divert" provision

Sections 16(B) and 16(C) prohibited Defendants from "[d]ivert[ing] or attempt[ing] to divert any business or customer of the business franchised under this Agreement to any competitor, by direct or indirect inducement or otherwise, to do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System." (Section 16(B)(1) & (C)(1)) Plaintiff alleges that "[t]he Gondals" violated this section of the covenants not to compete through, *inter alia*, taking the following actions: (1) "agree[ing] to let [Mr.] Stella 'take over' the School" and "allow[ing] The Gem School to operate under [Mr. Gondal]'s license[;]" (2) "allow[ing] the Gem School access to the School's customer records and email system so that [Mr.] Stella could send the April 28th letter[;]" and (in the case of Mr. Gondal) "review[ing]" that letter before it was sent; (3) "encourag[ing] Goddard's customers to remain with The Gem School . . . at the May 1st [meeting;]" and (4) "instructing the staff to tell customers that the name [of the school] had changed because GSI had prevented the School from receiving a higher star rating." (D.I. 52 at 4-5)

It is not clear to the Court that all of the above-referenced activity amounts to evidence of Defendants' violation of the "divert or attempt to divert" portion of the covenants.[20] But the Court agrees that a violation has been shown in light of: (1) the evidence regarding Mr. Gondal's review of the April 28 letter; and (2) his presence at and actions during the May 1 meeting.

The May 1 meeting, after all, was clearly held to "to assuage concerns that parents [who were customers of the Middletown Goddard School] might have concerning the transition" of their children to The Gem School, (D.I. 54 at 3), and to encourage them to make that transition. Mr. Gondal discussed with Ms. Patterson what should go into the April 28 letter inviting parents to that meeting. (D.I. 53, ex. C at 41-42) And Mr. Gondal was present at the May 1 meeting, (Tr. at 224–25), at which he addressed the parents. In doing so, he "broke the . . . news" to the parents, (D.I. 52, ex. D at 46-47), that the school now was no longer a Goddard School and was "under the new company name[,]" (D.I. 53, ex. B at 270; *see also* Tr. at 224-25; D.I. 52, ex. D at 46).[21] The directors then went on to tell the parents that at The Gem School, the staff, the quality of care and the way that the students were to be taught would all remain the same (as compared to the Middletown Goddard School). (D.I. 52, ex. D at 47-48)

---

[20]     For example, as to the Gondals' agreement to allow Mr. Stella to "take over" the school and to use the Middletown Goddard School's OCCL license, while these acts certainly *relate in some way* to The Gem School's ability to service former customers of the Middletown Goddard School, it is unclear to the Court whether they fall within the realm of what it means to "divert or attempt to divert" Plaintiff's customers by "direct or indirect inducement or otherwise[.]" As to other alleged violations (e.g., allowing The Gem School access to the Middletown Goddard School's customer records and e-mail system in advance of the sending of the April 28th letter, or Mr. Gondal's instructing the staff to tell customers why the name of the school had changed), there is not robust evidence that *the Gondals* (as opposed to other persons working for the Middletown Goddard School) actually did those things. (*See, e.g.*, Tr. at 247-48)

[21]     Mr. Gondal did not mention that he was no longer an owner of the school during the meeting. (D.I. 53, ex. B at 270).

It is worth noting that Plaintiff has not put forward much evidence as to exactly *how* Mr. Gondal helped with the April 28 letter, or about *what he did and said* during the May 1 meeting. This is strange, because clearly such details were important—in light of Plaintiff's assertion that Mr. Gondal violated this portion of the covenants not to compete. What little there is of record suggests that Mr. Gondal's actions here were fairly minimal in scope. But there is at least enough to indicate that, as to these events, Mr. Gondal did *something* amounting to an "attempt to divert . . . [at least one] customer of the [Middletown Goddard School] . . . to [a] competitor" (i.e., The Gem School), in violation of this portion of the covenants not to compete.

**b.      The "[e]mploy or seek to employ" provision**

Under Sections 16(B)(2) and 16(C)(2) of the FA, Defendants shall not "[e]mploy or seek to employ any person who is at that time employed by [Plaintiff] or by any of [its] franchisees, or otherwise directly or indirectly [] induce such a person to leave his or her employment[.]" (Section 16(B)(2) & (C)(2))  Plaintiff contends that "[t]he Gondals violated this provision by giving the School, complete with a staff, to [Mr.] Stella. . . . [,because t]here is simply no way that The Gem School would have been able to hire the exact same staff over one weekend without being afforded access and help from the Gondals[.]" (D.I. 52 at 5)

With regard to this claim, Defendants note that the staff of the Middletown Goddard School were no longer employees of BHSG as of April 28, 2017 (a fact not here disputed by Plaintiff), and so Defendants (or, for that matter, The Gem School) could not thereafter have "[e]mploy[ed] or [sought] to employ" a person who was "at that time employed by" Plaintiff. (D.I. 53 at 6)  And as to whether Defendants "[sought] to employ" a member of the staff at the Middletown Goddard School for the benefit of The Gem School earlier than April 28, 2017, or

29

"[sought] to induce" such a person " to leave his or her employment" with Plaintiff prior to April 28, 2017 (i.e., to encourage them to work at The Gem School in the future)—there is simply no evidence in the record to support such a conclusion. That is, the Court has been presented with no evidence relating to *how* employees of the Middletown Goddard School came to be offered positions at The Gem School and started work there on May 1, 2017. Was that process directly facilitated by Mr. Gondal? Or by Mr. Stella? Or by someone else? For whatever reason, the record is silent.

Plaintiffs argue that it "defies common sense" that the Gondals did not play some role in inducing the staff to work for The Gem School—in part because at least some staff members did not even know who Mr. Stella and his business partner were at the time of the May 1st transition. (D.I. 58 at 2 (citing D.I. 52, ex. E at 62, 121)) But the Court cannot speculate on matters like these. It needs to be able to cite to at least some record evidence indicating that what seems like "common sense" to Plaintiff is what actually happened here. And it has not been provided with such evidence. Therefore, as to this claim, Plaintiff has not demonstrated a likelihood of success on the merits.

### c.    The "[o]wn, maintain, engage in, be employed by, finance, or have any interest in" provision

Sections 16(B)(3) and 16(C)(3) of the Franchise Agreement provide that Defendants may not "[o]wn, maintain, engage in, be employed by, finance, or have any interest in" any "other child daycare or preschool learning center or business" (as to the in-term covenant not to compete) and may not do any of these things with regard to "any child daycare or preschool

30

learning center or business at the premises of the School or within a radius of 10 miles[22] of the

School or any existing or proposed School" (as to the post-term covenant not to compete).

(Section 16(B)(3) & 16(C)(3))  There is no dispute here that, for the purposes of the motion, The

Gem School is the relevant "child daycare or preschool learning center or business [at the

premises of the School]" at issue.

Thus, there are six types of acts that could cause a violation of Section 16(B)(3) and

16(C)(3) ("[o]wn, maintain, engage in, be employed by, finance, or have any interest in").  The

Court will examine each of these six terms, in order to determine whether Plaintiff has

demonstrated a likelihood of success of showing a violation of these portions of the covenants

not to compete.

### i.      "[o]wn"

There is no evidence in the record that Defendants have in the past or do now "own" any

portion of The Gem School.  The Gem School is an entity owned by Mr. Stella and his business

partner Mr. Coleman.  (Tr. at 129)  Therefore, Plaintiff is unlikely to succeed on the merits with

regard to this term.

### ii.      "maintain" and "engage in"

Plaintiff argues that Mr. Gondal both "maintain[ed]" and "engage[d] in" the business of

The Gem School by, *inter alia*:  (1) "allowing the Gem School to use his license for almost four

months" and by later "aiding [Mr.] Stella in obtaining a second license . . . because without a

license from the State of Delaware, The Gem School could not have opened or operated"; (2)

having his "accountant create [T]he Gem School Inc. and contact[ing] various vendors to obtain

---

22      In its proposed Order, Plaintiff requests a 3-mile restriction.  (D.I. 8-5 at 2)

necessary services, like insurance and a tuition payment processor"; (3) "attend[ing] the May 1st meeting with parents . . . work[ing] at The Gem School for two weeks [] receiv[ing] a $500 paycheck, and answer[ing] Mr.] Stella's questions" about the school's operation; and (4) providing "considerable financial support to The Gem School by paying $27,000 to Mr. Stella's associates, paying $14,927.23 in expenses for The Gem School, and forgoing rent in May 2017."[23] (D.I. 52 at 6)

Neither party argues that the terms "maintain" or "engage in" are ambiguous. And pursuant to the plain meaning of those terms,[24] the evidence indicates that Mr. Gondal maintained and/or engaged in The Gem School or The Gem School's business at least when he: (1) filed the renewal application on behalf of The Gem School with the OCCL, thereby preventing the school's closure until the new license application was filed and approved, *see supra* at 12-13; (2) contacted vendors to assist The Gem School, *see supra* at 12-13; (3) helped obtain a new child care license for The Gem School, *see supra* at 18-19; (4) worked for a few weeks at The Gem School in May 2017, *see supra* at 18; and (5) otherwise coordinated with Mr.

---

[23]     With regard to these alleged payments or the allegations regarding the foregoing of rent, the Court will not discuss them further in this subsection, but they will be discussed in more detail below, to the extent they relate to other provisions of the covenants not to compete. The Court is not certain that all of the "financial support" referenced here would constitute an effort on the part of the Gondals to "maintain" The Gem School. However, at least as to the $14,927.23 in payments referenced by Plaintiffs, the record appears to indicate that they were: (1) made by Defendants between May 2017 and August 2017; (2) to pay for expenses related to The Gem School. (Tr. at 217-18; *see also* Plaintiff's Hearing Exhibit 15) And so the Court assumes, *arguendo*, that these payments would also be evidence of Defendants "maintain[ing]" The Gem School in that time period.

[24]     The FA does not provide specific definitions for these terms, nor for any other terms used in the document. (*See* D.I. 1-1, ex. 1)

32

Stella, the school directors, and others about the opening and operation of the school, *see supra* at 15-16, 19.

Defendants' arguments to the contrary are not persuasive. For example, Defendants assert that "the fact that Mr. Gondal's name remained on the Delaware State [OCCL] license for the Gem School until the new license could be approved" was "*passive* activity, limited in duration" that cannot amount to "maintain[ing]" or "engag[ing] in" The Gem School's business. (D.I. 53 at 6 (emphasis in original)) But as was noted above, Mr. Gondal took *active* steps to help The Gem School obtain the renewal application (i.e., he interacted with OCCL representatives and he filed the application). (D.I. 8-3, ex. B; Tr. at 195, 212-13) And though Mr. Gondal's acts there may well have been somewhat limited in duration, there is no exception in this portion of the FA for limited-duration conduct. Defendants also argue that "transitioning operations over to the new school" or "communicating with vendors" amounts to "transitioning work" and not work to "maintain" or "engage in" The Gem School's business. (D.I. 53 at 7) In the Court's view, that is mere wordplay; any fair reading of the (broad) terms "maintain" or "engage in" would have to sweep in the conduct described above.

### iii.    "be employed by"

There can be no dispute that Mr. Gondal was employed by The Gem School for a period of two weeks in the beginning of May 2017, for which he was paid $500. (D.I. 18-1 at ¶ 30; Tr. at 214; D.I. 54, ex. E at 37-38) Though this offending conduct was brief, it would still constitute a violation of this portion of Sections 16(B)(3) and (C)(3).

### iv.    "finance"

33

Plaintiff argues that the Gondals have "finance[d]" The Gem School in three specific ways: (1) "they did not charge [Mr.] Stella anything for the School's tangible and intangible assets, instead deferring any potential payment until a future sale. . . . [, which] certainly amounts to providing in-kind, start-up funding[;]" (2) "the Gondals have paid The Gem School more than they received in State tuition payments [that were rightfully The Gem School's property]"—a surplus of "almost $20,000 more in cash and goods than [the Gondals actually received from the State that were rightfully the property of The Gem School][;]" and (3) "by not collecting rent in May [2017] and otherwise charging what [Mr.] Stella believes is a below market rent, the Gondals have, in essence, provided The Gem School with thousands of dollars of additional working capital per month." (D.I. 52 at 9) These allegations, in turn, beg the question: what would it mean for the Gondals to "finance" The Gem School in the context of that term's use in the FA?

The term "finance" is not defined by the FA, but typically, to "finance" an entity means to "raise or provide funds" for it or to it. BLACK'S LAW DICTIONARY 706 (9th ed. 2009). Thus, prototypical examples of Defendants "financ[ing]" The Gem School would seem to include things like: (1) a payment of money from a Defendant to The Gem School; (2) a Defendant obtaining a loan on behalf of The Gem School; and/or (3) a Defendant providing The Gem School with capital to cover operating cash flow in the face of operating losses.

As noted above, Plaintiff first contends that the Gondals have provided a substantial amount of in-kind "financ[ing]" to The Gem School, by providing the school with tangible and intangible assets without receiving immediate payment for those assets in return. (D.I. 52 at 9 (citing Tr. at 144, 188, 211)). The record indicates that Mr. Stella took over the assets (e.g.,

34

school equipment) of the Middletown Goddard School and did not pay the Gondals anything for those assets, nor did he immediately "credit" the Gondals on their outstanding debt to him for the use of these assets. (Tr. at 143-44, 211) Instead, Mr. Stella stated that in light of the above-referenced transfer of assets, were he to make a net profit from running The Gem School (either through a later sale or otherwise), he would credit the Gondals' debt to him in some way that relates to this asset transfer. (*Id.*)

The Court understands the argument Plaintiff is making here—that a transfer of school assets from Defendants to The Gem School, for no immediate payment in return, should count as a manner of "financ[ing]" The Gem School's operations. And the Court is cognizant of the harm that could flow, were franchisees able to evade the requirements of covenants like these by engaging in activity that avoids the letter (but not the spirit) of the covenants' restrictions.

But on the other hand, it is not clear to the Court that the plain meaning of "finance" encapsulates this type of non-monetary, in-kind transfer of school assets (one that might—or might not—later involve a payment back to Defendants relating to the transfer). (*Cf.* D.I. 53 at 7 (Defendants arguing that under "Plaintiff's interpretation, a debtor whose house has been foreclosed upon by a mortgage lender would be 'financing' . . . the mortgage lender until the foreclosed real estate is sold to a third-party. That is absurd.")) And Plaintiff has not done the work necessary to demonstrate that this conduct would, in fact, likely fall under the FA's prohibition against such "financ[ing.]" Plaintiff, has not, for example: (1) proposed a definition of "finance" (citing to corresponding authority) that would encompass these contributions, or (2)

pointed to extrinsic evidence[25] making clear that the parties understood the term to have such a meaning.[26] And so the Court—being mindful that it must strictly construe the terms of the FA's covenants not to compete—finds that Plaintiff has not demonstrated a reasonable probability that it can show Defendants "finance[d]" The Gem School via these in-kind contributions.

Plaintiff next focuses on the Gondals' alleged transfer of a net of $20,000 in funds to The Gem School. Defendants, however, argue that these monies are "upon closer examination, [] simply an offset of the tuition mon[ies] that the Gondals were still receiving from the [S]tate of Delaware during [the] transition period." (D.I. 53 at 7) This dispute relates to funds that Delaware continued to deposit into BHSG's bank account after The Gem School opened (payments from June 2017 through July 2017). The monies were purchase of care and STARS

---

[25]     Pursuant to Pennsylvania law, if a term in a contract is ambiguous as to its meaning, parol evidence is admissible to explain or clarify or resolve the ambiguity. *Kripp*, 849 A.2d at 90-91. A contract term is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Id.*

[26]     Plaintiff does cite to one case, *Lawn Doctor, Inc. v. Rizzo*, 646 F. App'x 195 (3d Cir. 2016), as standing for the proposition that this transfer of "in-kind" assets "amounts to providing . . . start-up funding [or "financ[ing]"] for The Gem School." (D.I. 52 at 9) The Court, however, does not find *Rizzo* to be particularly enlightening as to the meaning of the disputed term. In that case, the United States Court of Appeals for the Third Circuit found that the defendants, former franchisees of the plaintiff, had violated the terms of a consent injunction when they sold a competing lawn care business to a third party, in exchange for a promissory note of $275,000. *Rizzo*, 646 F. App'x at 199. Although the defendants had referred to this transaction (in their appellate brief) as one where they had provided "financing" to the third party, the *Rizzo* Court did not make a determination that this transaction, in fact, amounted to a form of "financing." *Id.* Instead, the *Rizzo* Court found that the reason why this conduct violated the injunction at issue was because that injunction "specifically prohibited" defendants from "act[ing] as a competitive lender"—and because the defendants had taken on just such a role in the sale of the lawn care business. *Id.* Indeed, the source of the breach at issue was a term in a restrictive covenant that prevented the defendants from "hav[ing] any interest as a . . . *lender* . . . in any Competitive Business"—not one relating to "financing," as Plaintiff alleges. *Lawn Doctor, Inc. v. Rizzo*, Civil Action No. 12-1430 (PGS), 2012 WL 2505537, at *3 (D.N.J. June 27, 2012) (emphasis added).

36

program tuition subsidy payments that should have come directly to The Gem School but did not,

because The Gem School was operating on Mr. Gondal's OCCL license at that time. *See supra*

at 20.

The record with regard to these subsidies is not crystal clear. Here is what the Court can

glean from that record about the way Defendants and Intervenors accounted for the subsidies:

> (1) It does seem evident that from June to August 2017, BHSG,
> Mrs. Gondal and Yellow Grass paid either Mr. Stella's loan
> servicer (FCS Lending LLC) or Mr. Stella's employee (Marla V.
> Michael) a total of $27,000. (Plaintiff's Hearing Exhibit 15; Tr. at
> 159)
>
> (2) Although Mr. Stella's testimony was a bit uncertain on this
> topic, he appeared to indicate that these $27,000 in payments were
> meant to reimburse The Gem School for the subsidy payments
> referenced above. (Tr. at 160, 162-63)
>
> (3) And when Mr. Gondal was asked how much in subsidy
> payments the Gondals (through BHSG) had received from the State
> that were really The Gem School's property, he identified four
> such payments, made in June and July 2017, totaling $23,927.23.
> (Tr. at 218-19; *see also* Tr. at 164-65; Plaintiff's Hearing Exhibit
> 15)

Thus, it appears (at least from the evidence set out above) that there may have been an

overpayment from Defendants to Mr. Stella with regard to reimbursement of these subsidies,

totaling $3,072.77. With the amount of such a discrepancy being so small, and with the other

financial entanglements at the time between Defendants an Intervenors being so numerous, the

Court could not find this to be persuasive evidence of additional "financ[ing.]"

The last issue Plaintiff raised here relates to the fact that: (1) in May 2017, the Gondals

did not collect $14,000 in rent from The Gem School; and (2) in his deposition, Mr. Stella stated

his belief that the $14,000 per month that The Gem School pays to the Gondals in rent for the

37

school building is a "low[,]" below-market figure. (Plaintiff's Hearing Exhibit 15; D.I. 56, ex. 17; Tr. at 159; D.I. 52 at 9) As to the latter comment by Mr. Stella, the Court does not have enough concrete evidence before it to determine whether (even assuming this could amount to a form of "financ[ing]") the rent The Gem School pays to the Gondals is truly below-market. As for the uncollected rent, perhaps there is a better case that it would amount to an (indirect) method for Defendants to provide funds to The Gem School (e.g., instead of *paying monies* to The Gem School, simply *failing to collect monies owed*). Unlike the transfer of in-kind assets referred to above, this failure to collect rent does not involve an associated transfer of goods, and it is not clear that the Gondals expect any future payment for the month's rent in question. While the issue is a close one, the Court will assume *arguendo* that this too was another (relatively small) way that Defendants "finance[d]" The Gem School in this time frame.

### v. "have any interest in"

Under the terms of the FA, Defendants may not "have any interest in" The Gem School. (Sections 16(B)(3) & (C)(3)) Plaintiff identifies two primary ways in which, it alleges, Defendants have an "interest" in The Gem School.[27] These are that: (1) the Gondals owe a debt to Bluegrass (and thus, to Mr. Stella), which Mr. Stella may forgive in whole or in part when he sells The Gem School, such that Defendants "hold a direct interest in the going concern value of The Gem School"; and (2) Mrs. Gondal's lease (via Yellow Grass) to The Gem School of the

---

[27]     Plaintiff does articulate a third way that Defendants are argued to have an "interest in" The Gem School: that they "hold an ownership interest in The Gem School . . . because the school cannot be sold without releasing the [UCC] lien [] Bank [of America] has on the school's assets." (D.I. 52 at 7) Defendants do not address this argument. The Court does not understand how Bank of America's right to take possession of certain school-related property (were certain contingencies to occur) can amount to Defendants having an "interest" in The Gem School.

38

school property/building amounts to such an interest. (D.I. 52 at 7-8) The dispute, then, is whether the definition of "interest" (as that term is used in the FA) is broad enough to encompass the Gondals' existing debt to Bluegrass and the lease arrangement with The Gem School.

And so, the next question is: what is the plain and ordinary meaning of the term "interest," as that term is used in the FA? Defendants did put forward two dictionary definitions of "interest," which define the term as "a legal share in something; all or part of a legal or equitable claim to or right in property[,]" or as a "right, title, or legal share in something." (D.I. 53 at 8 (citing BLACK'S LAW DICTIONARY 885 (10th ed. 2014); MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/interest)); *see also Alexander Mfg., Inc. Emp. Stock Ownership Plan & Trust v. Illinois Union Ins. Co.*, 560 F.3d 984, 988 (9th Cir. 2009). Plaintiff has not proffered a different "ordinary meaning" for this term, nor has it explained why Defendant's proposal is inaccurate or otherwise does not capture the parties' intent in drafting the FA. (D.I. 58 at 4–5) Thus, for purposes of this motion, the Court will consider the ordinary meaning of "interest" to be: (1) "a right, title, or legal share in something[;]" or (2) "all or part of a legal or equitable claim to or right in property." Below, the Court addresses whether the debt or lease agreement at issue fits within the confines of these definitions.

#### (a) The debt

First, as to the debt, Plaintiff's theory is that "BHSG and [Mrs. Gondal] gave the School to [Mr.] Stella for the promise of a future payment from [Mr.] Stella to the Gondals. [] Providing a fully functioning business for the promise of future payment . . . gives the Gondals an interest in The Gem School's continued existence and value at sale." (D.I. 58 at 4 (citation omitted); *see also* D.I. 52 at 7 (Plaintiff asserting that the Gondals are "*de facto* equity holders in

[T]he Gem School — a sale would result in the delivery of significant financial value to them"))
By way of a factual re-cap as to this issue, at the same time that Yellow Grass purchased the
school building and the property on which it sits, Yellow Grass and the Gondals also signed an
agreement promising to pay Bluegrass (i.e., Mr. Stella) $425,000. (Tr. at 121-29, D.I. 18-1, ex.
2) That amount, in turn, represents an amount of debt that BHSG and the Gondals had
previously incurred with Bluegrass (and Mr. Stella). (Tr. at 121-29) The parties agree that the
Gondals have stopped paying on this debt to Bluegrass, and that, in the event that Mr. Stella sells
The Gem School, the remaining debt may be reduced or eliminated, depending on the amount of
net profit that Mr. Stella earns on the sale. (D.I. 52 at 7-8, D.I. 53 at 7-8; *see also* Tr. at 143-44)

The Court is unconvinced that any "promise of future payment" that Defendants might
receive from Mr. Stella—were he to later sell The Gem School and earn a profit while doing
so—amounts to "a right, title, or legal share in" or a "legal or equitable claim to or right in" The
Gem School. The Court so concludes for two primary reasons.

First, Plaintiff has never really *articulated how* this "promise of future payment" could be
said to amount to something like a legal right, title or share in the school itself. Even assuming
that this (apparently unwritten) promise from Mr. Stella were binding, it certainly does not
amount to a property right in the school. Nor are Defendants legal owners of The Gem School.
Were the school to be sold tomorrow, Defendants would have no role in that transaction, would
have no legal right to stop the transaction and could expect to have no legal right to any direct
payment resulting from the transaction. (D.I. 53 at 8 (Defendants noting that "The Gem School
[] could be dissolved, liquidated, merged, or sold without the Gondals' permission and without
the Gondals receiving any money or rights.")) And so, in at least the traditional way one thinks

40

of legal "right[s,]" legal "title[,]" or a "legal share in" something, Defendants do not seem to possess any such interests.

Second, there appear to be many eventualities whereby—even if The Gem School were to be sold—that transaction would not have even an *indirect* impact on Defendants. Mr. Stella testified that while the Gondals may repay the debt through proceeds from the sale of The Gem School, they may also repay that debt (at least in part) in various other ways—including via foreclosure proceedings associated with other of the Gondals' properties. (Tr. at 100-01,144) The fact that a number of contingencies would have to come to pass before any sale of the school would impact the Gondals' debt further indicates why that debt does not likely amount to an "interest" in the school.

#### (b)     The lease

Second, with regard to the lease, Plaintiff's view is that it provides Mrs. Gondal with an "indirect interest" in The Gem School, because it "link[s] payment under [the] lease to the operation of [the school.]" (D.I. 58 at 4-5; *see also* D.I. 52 at 8 (Plaintiff arguing that "[t]he Gondals' lease of the Property to The Gem School. . . . provides a direct financial link between the Gondals and [T]he Gem School's operations"))

The Court does not see how the lease, and the rights to payment associated therewith, amounts to "a right, title, or legal share" in The Gem School, or "all or part of a legal or equitable claim to or right in" The Gem School. To the contrary, while the lease may entitle Mrs. Gondal to have the legal *right to receive rent payments* from The Gem School, that seems a far cry from a legal right to or legal share of the school itself. Nor can the Court see what type of "legal or

41

equitable claim" the lease agreement would give Mrs. Gondal to The Gem School, were the school to be sold or transferred, for example.

In its pre- and post-hearing briefing, Plaintiff primarily cited to four cases in support of a contrary conclusion—that the lease does equate to the requisite "interest." (D.I. 20 at 3; D.I. 52 at 8) For the following reasons, however, the Court does not find these cases to be persuasive.

First, Plaintiff cites *Marblelife, Inc. v. Stone Resources, Inc.*, Civil Action No. 10-2480, 2012 WL 1719439 (E.D. Pa. May 16, 2012), as standing for the proposition that "leasing equipment and vehicles to [an] entity created by [an] associate of [a] former franchisee violated [a] previous order enforcing [a] covenant not to compete[.]" (D.I. 52 at 8; *see also* D.I. 20 at 3) In *Marblelife*, however, the relevant portion of the preliminary injunction order at issue prevented the defendant "from engaging, participating or assisting in any business or offering within [the relevant geographic area, the relevant services or products.]" *Marblelife*, 2012 WL 1719439, at \*3. In finding that the defendant company violated this portion of the order, the *Marblelife* Court concluded that the defendant had provided "assistance" to a competing third party company by: (1) encouraging its own former customers to employ the competing company's services; (2) providing its employees to the third party company; and (3) having its principal provide services to the third party company. *Id.* at \*7-8. *Marblelife* does not address the term "have any interest in" and does not appear to offer direction as to how that phrase should be interpreted.

Second, Plaintiff argues that in *Mister Softee, Inc. v. Amanollahi*, Civ. No. 2:14-CV-01687 (KM)(MCA), 2014 WL 3110000 (D.N.J. July 1, 2014), the court found that the defendant had violated a "covenant not to compete with similar language to [the instant] case[.]" (D.I. 52 at

42

8) In *Mister Softee*, the restrictive covenant included a non-compete provision, which prevented the defendant from doing a number of things relating to a competing business, including "hav[ing] any interest in" such a business. *Mister Softee*, 2014 WL 3110000, at \*9. However, while the *Mister Softee* Court found that the defendant violated the non-compete provision, it never provided any interpretation of the "have any interest in" term. That was because the defendant never argued he had *not* violated the terms of the provision; instead, he challenged only the enforceability and reasonableness of the provision. *Id.* at \*9-12.

Third, Plaintiff cites to *Victory Lane Quick Oil Change, Inc. v. Darwich*, 799 F. Supp. 2d 730 (E.D. Mich. 2011), for the proposition that "leasing [a] location to [a] business that [a] former franchisee helped create violated the . . . prohibition on having an 'interest in' a competing business." (D.I. 52 at 8 (footnote omitted)) In *Victory Lane*, the post-term covenant not to compete at issue stated that "[t]he Franchisee, the Owners and the Personal Guarantors will not . . . own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or Entity engaged in any Competitive Business [in the relevant geographical area.]" *Victory Lane*, 799 F. Supp. 2d at 734 (emphasis omitted). In that case, a defendant company ("Darwich Brothers") (one of the signatories to the covenant) sold the assets of its franchise to another party ("Belal Darwich") (who was not a signatory to the covenant), and Belal Darwich began operating an oil change business on the premises that was in competition with the plaintiff/franchisor. *Id.* at 733. Darwich Brothers, however, remained as the named tenant on the lease agreement for the space in which Belal Darwich's company was now operating. *Id.* Based upon this ongoing relationship, the *Victory Lane* Court concluded that because Darwich Brothers "remains the tenant at the [location where the competing business was

43

now operating, it was] allowing [the competing business] to occupy the same location [as it, the former franchisee, has once occupied.]" *Id.* at 734. For that reason, the *Victory Lane* Court found that Darwich Brothers was "arguably 'connected with,' has an 'interest in,' or is 'assist[ing] any person or Entity engaged in any Competitive Business' in violation . . . of the franchise agreement." *Id.*

The decision in *Victory Lane* does not persuade the Court that Defendants likely violated the "have any interest in" portion of Sections 16(B)(3) and (C)(3). For one thing, the force of the *Victory Lane* decision is lessened, simply because the *Victory Lane* Court pointed to multiple terms in the applicable covenant that "arguably" gave rise to liability—without focusing particularly on any one term. One of the other terms called out by that Court—the term "connected with"—can be read as having far broader applicability than the term "have any interest in" might. It seems very clear, for example, that the Darwich Brothers were "connected with" Bilal Darwich's company, given the facts at issue in *Victory Lane*. As a result, it is hard to know how much impact the "have any interest in" term in the covenant actually had on the *Victory Lane* Court's ultimate decision. Perhaps more importantly, the *Victory Lane* Court provided no substantive analysis as to *why* it felt that the sub-lease situation at issue there amounted to a violation of the "have any interest in" clause of the applicable covenant. It is not clear, for example, whether the *Victory Lane* Court was defining the term "interest" in the same manner that the Court has set out above. And so, for these reasons, the Court cannot find *Victory Lane* to be persuasive authority.

Lastly, Plaintiff cites to the decision in *Nat'l Propane Corp. v. Miller,* 18 P.3d 782 (Colo. Ct. App. 2000). (D.I. 20 at 3) But if anything, that case hurts Plaintiff's argument. *Nat'l*

*Propane* involved a restrictive covenant in which former franchisees and their shareholders were not permitted to "directly or indirectly, in any manner whatsoever, own, have any other interest in or right with respect to . . . , or work or consult for any [competing person or business in the relevant geographic area.]" *Nat'l Propane*, 18 P.3d at 787 (emphasis omitted). The restrictive covenant in *Nat'l Propane*, then, employed the term "hav[ing] any other interest in or right with respect to"— a phrase that is ostensibly *broader* than the term "have any interest in" found in the FA.

In evaluating the trial court's decision, the *Nat'l Propane* Court explained that "[u]nder the majority rule, absent a contractual provision to the contrary, a noncompetition covenant does not preclude a party from merely leasing property or loaning money to others engaged in a competing business." *Id.* at 787 (citations omitted). The Court then explained that while the defendant had loaned his relatives several hundred thousand dollars to get them started in a competing business, and had leased those relatives land for their offices, "the noncompetition covenant at issue does not prohibit the mere loaning of money or leasing of land, and its terms are not broad enough to cover such activities." *Id.* at 788. Thus, even though the provision at issue in *Nat'l Propane* employed broader language than the provision at issue here, a lease arrangement was not found to violate a term prohibiting the holding of an "interest" in a competing company.

### (c) Conclusion

Therefore, Plaintiff has not demonstrated a likelihood of success on the merits as to its claim that Defendants have violated the "have any interest in" portion of Sections 16(B)(3) and (C)(3) of the FA.

45

###### vi. Conclusion: the "[o]wn, maintain, engage in, be employed by, finance, or have any interest in" provision

Plaintiff has demonstrated a likelihood of success on the merits in proving that Defendants have (largely through the acts of Mr. Gondal), in the period of time between early April and August 2017, "maintain[ed], engage[d] in, be[en] employed by [and] finance[d]" The Gem School in certain ways, which would violate Sections 16(B)(3) and/or 16(C)(3) of the FA. At the time of the preliminary injunction hearing, Defendants' involvement in each of these activities appears to have stopped; there is no evidence in the record that these violations are ongoing.

###### d. Conclusion: Likelihood of Success on the Merits as to the Breach of Contract Claims Regarding the Covenants Not to Compete

Plaintiff has demonstrated a likelihood of success on the merits with regard to certain of its claims that Defendants have violated Sections 16(B)(1) and (B)(3) and/or Sections 16(C)(1) and (C)(3) of the FA.

### 2. Breach of Contract: Misuse of Confidential Information

Plaintiff next alleges that it is likely to succeed in its claims that the Gondals breached Section 9(B) of the FA, which prohibits Defendants "during the term of th[e] Agreement or thereafter, [from] communicat[ing,] divulg[ing,] or us[ing] for the benefit of any other person, persons, partnership, association or corporation, any material in which [GSI] claim[s] copyright protection, any trade secrets or confidential information, knowledge or know-how concerning the methods of operation of a School" that was previously disclosed to Defendants. (D.I. 1-1, ex. 1 at § 9(B) ("Section 9(B)")) (D.I. 8-2 at 18; D.I. 52 at 9-10; *see also* D.I. 1 at ¶¶ 66-73) By the

time it filed its supplemental post-hearing opening brief, Plaintiff had distilled those alleged violations at issue down to the following: (1) "The Gem School copied large portions of the [Middletown Goddard] School's parent and employee handbooks[;]" (2) "[u]ntil a new curriculum was implemented in August [2017], the substance and manner of what The Gem School staff taught their students was the same as they were at the [Middletown Goddard] School[;]" and (3) "The Gem School's teachers continue to use operational methods and procedures they learned at the [Middletown Goddard] School." (D.I. 52 at 9-10)

The record does not clearly show that GSI curriculum[28] or GSI proprietary methods and procedures were used at The Gem School. (D.I. 52, ex. E at 43-45; Tr. at 245-47) But it does seem as if The Gem School made use of content drawn from the Middletown Goddard School's parent and employee handbooks,[29] when creating The Gem School's version of the same documents. (D.I. 20-1 at ¶¶ 9-11; id., exs. B & C; D.I. 52, ex. D at 109-10)

Yet even as to the parent and employee handbooks, there is a failure of proof as to whether their use by The Gem School can be linked to the Gondals' violation of Section 9(B). The difficulty here is that the record shows that Ms. Cioci and Ms. Patterson were the people

---

[28] It appears undisputed that by August 2017, The Gem School was utilizing a non-GSI curriculum purchased from a third-party vendor. (Tr. at 237, 242) When asked at the preliminary injunction hearing about whether The Gem School used GSI curriculum between May 1, 2017 and August 2017, Ms. Phillips replied "[n]o" and appeared to indicate that the school used other lesson plans approved by the State of Delaware. (Id. at 247 ("Through the state[] we still have the lesson plan through [Delaware's] Stars [program]."); see also D.I. 52, ex. E at 45 (Ms. Phillips stating in her deposition that The Gem School "didn't really have a curriculum" in this time period)) The record here is not robust and is not a model of clarity, but it does not clearly show that a GSI curriculum was being used during this time frame.

[29] Although Mr. Gondal drafted the Middletown Goddard School's parent and employee handbooks, he did so by using content provided by Plaintiff. (D.I. 53, ex. B at 263-64; D.I. 20-1 at ¶¶ 9-11; id., exs. B & C)

47

who created The Gem School's parent and employee handbooks, respectively. (D.I. 52, ex. D at 109-10; Tr. at 238-39) Both women previously worked for The Middletown Goddard School. It seems certain that to the extent the Gondals first "divulge[d]" to Ms. Cioci and Ms. Patterson the content of any GSI material found in the Middletown Goddard School's handbooks, they did so at a time when this was not forbidden by the FA (i.e., prior to the FA's termination). (Section 9(B) (noting that Defendants were permitted to exchange materials covered by this Section with GSI employees who "must have access to [them] in order to operate the [Middletown Goddard School]")) And there is very little information in the record (if any) as to how or to what extent the Gondals played a role in "divulg[ing]" or "communicating" any such material to Ms. Cioci or Ms. Patterson at any point after Section 9(B) no longer permitted such acts—or how the Gondals took any other action that amounts to a violation of Section 9(B). (Tr. at 54-55 (Mr. Scopinich testifying that the Gondals were denied access to GSI's online system as of May 1, 2017); *id.* at 194 (Mr. Gondal testifying that the Gondals were not in the United States from April 13 through April 26, 2017); D.I. 18-1 at ¶ 34 & ex. 7 (indicating that the Gondals mailed back to GSI any GSI manuals by May 3, 2017))

For these reasons, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits as to this claim.

### 3.    **Breach of Contract: Option to Purchase School Assets**

Section 15 of the FA ("Section 15") grants Plaintiff an option to purchase the assets of the school within 60 days of the termination or expiration of the FA. (D.I. 1-1, ex. 1 at § 15(A)(1)) Section 15(A)(1) states "[o]n termination or expiration of the Agreement, regardless of the reason, [GSI] shall have the right . . . for 60 days starting on the date of termination or expiration,

to purchase the assets of the School" and that Defendants may not "offer to sell the assets of the school . . . without first having offered these rights to" Plaintiff. (*Id.*)

Plaintiff, in its pre-hearing briefing, did not assert that it had demonstrated a likelihood of success on the merits as to a violation of Section 15. (*See* D.I. 8-2; D.I. 20) Its counsel did not address the issue during oral argument at the preliminary injunction hearing. But thereafter, in a two-sentence argument in its supplemental post-hearing opening brief, Plaintiff for the first time alleged that "the Gondals have refused [to] sell GSI the [Middletown Goddard] School's assets." (D.I. 52 at 10) Although Plaintiff does not make specific reference to Section 15 in this portion of its brief, the Court assumes that this is the section of the FA that Plaintiff was trying to put at issue there. (*See also* D.I. 1 at ¶ 77)

The Court finds that Plaintiff did not do enough to fully and fairly put this dispute in controversy during the preliminary injunction proceedings. Relatedly, it did not permit Defendants a full and fair opportunity to address this alleged breach of contract claim. For this reason, the Court will not address the issue further here.[30]

### 4. Trademark Infringement

In its pre-hearing briefing, Plaintiff asserted that it had a likelihood of success of prevailing on its claims that Defendants infringed Plaintiff's trademarks. (D.I. 8-2 at 24-28; *see also* D.I. 1 at ¶¶ 43-54) But during oral argument at the preliminary injunction hearing,

---

[30]     The Court notes that were it to address the merits of the issue, this is a claim that could turn on a determination of when, exactly, the FA terminated. Plaintiff's Chief Financial Officer, Robert Scopinich, testified that in "early May" 2017, Plaintiff "exercised [its] rights to buy the equipment in the school." (Tr. at 24; *see also* D.I. 1-2, ex. 13 at 3-4) If the FA terminated on February 28, 2017, as Defendants suggest, then Section 15(A)(1)'s 60-day time period (in which Defendants could not offer to sell the assets of the Middletown Goddard School to another party) would have expired by "early May" 2017.

Plaintiff's counsel acknowledged that it "looks like there's not any[] more trademark infringement happening." (Tr. at 257; *see also id.* at 282) And when it filed its supplemental post-hearing opening brief, Plaintiff had dropped any argument that it could demonstrate a likelihood of success on the merits as to this claim. (D.I. 52 (asserting a likelihood of success only as to breaches of Sections 9, 15 and 16 of the FA))[31] In light of this, the Court finds that Plaintiff withdrew its claim that such a violation could support the grant of the instant motion, and will not address the issue further.

## C. Plaintiff's Showing of Irreparable Harm As to Claims Where Plaintiff Has Demonstrated a Likelihood of Success

The Court next turns its attention to the second preliminary injunction factor: the risk of irreparable harm. As was discussed above, the Court has determined that Plaintiff is likely to succeed as to some of its claims that Defendants breached the FA, specifically as to certain provisions of the FA's covenants not to compete. The Court now assesses whether Plaintiff has demonstrated that, were Defendants not now enjoined from taking certain related actions going forward, Plaintiff would be irreparably harmed.

### 1. Standard of Review

---

[31]     After Intervenors filed their supplemental post-hearing answering brief, Plaintiff filed an additional "Supplemental Post-hearing Opening Brief" containing a new allegation based upon "additional evidence"—that The Gem School was infringing one of Plaintiff's registered trademarks in its use of the phrase "LEARNING FOR FUN. LEARNING FOR LIFE." on the side of The Gem School's bus. (D.I. 55) (The phrase was immediately removed from the bus thereafter.). (D.I. 57, ex. C) The Court agrees with Intervenors, (D.I. 57 at 1), that this brief was "procedurally inappropriate[,]" in that it was not called for by the Court's September 19, 2017 Order regarding supplemental briefing, nor did the Court grant Plaintiff leave to file a "Supplemental Post-hearing Opening Brief." For these reasons, the Court will not consider this additional evidence in resolving the instant motion.

In order to establish irreparable harm, "the moving party must generally show . . . that it will be irreparably injured pendente lite[32] if relief is not granted to prevent a change in the status quo." *A. L. K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 763 (3d Cir. 1971) (citation omitted). This must be "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (1989) "The preliminary injunction must be the only way of protecting the plaintiff from harm." *Id.* For instance, "[i]rreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (quotation omitted). "Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Id.*

However, "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)). Additionally, "[t]he cases are legion which say that where there has been a cessation of the conduct complained of, at any time prior to judgment, it is a matter for the exercise of the discretion of the court, as to whether an injunction should issue." *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 649 (3d Cir. 1958); *see also Supelco, Inc. v. Alltech Assocs., Inc.*, Civ. A. No. 86-2484, 1986 WL 9282, at *5 (E.D. Pa. Aug. 27, 1986) ("Defendants have stopped the offending conduct. . . . [, which] leads the Court to conclude that any remaining effect is *de minimis.* An injunction will therefore not issue.").

---

[32]     "Pendente lite" is defined as "[d]uring the proceeding or litigation; in a manner contingent on the outcome of litigation." BLACK'S LAW DICTIONARY (9th ed. 2009).

## 2. Analysis

When a preliminary injunction involves multiple claims, this Court evaluates each claim

with regard to both the likelihood of success on the merits and irreparable harm, with either

factor dispositive of the preliminary injunction inquiry. *Crane Co. v. Harsco Corp.*, 511 F. Supp.

294, 306 (D. Del. 1981) ("[Plaintiff] has established a substantial likelihood of success on the

merits of its fiduciary duty claim. . . . In order to justify preliminary injunctive relief *on this*

*claim*, however, [plaintiff] must also show that irreparable injury is likely to result from denial of

such relief.") (emphasis added); *see also ACE Am. Ins. Co. v. Onebeacon U.S. Holdings, Inc.*,

No. 12-4724, 2012 WL 12882120, at *5-6 (E.D. Pa. Dec. 7, 2012). By way of review, the claims

as to which Plaintiff has demonstrated a likelihood of success on the merits all relate to showings

that, between April 2017 and August 2017, Defendants violated certain portions of the FA's

covenants not to compete—i.e., that:

> (1) Mr. Gondal "attempt[ed] to divert" customers of the
> Middletown Goddard School to The Gem School prior to and at a
> May 1, 2017 meeting;
>
> (2) Mr. Gondal (and to a far lesser extent, other Defendants)
> "maintain[ed and] engage[d] in" The Gem School and its business
> in various ways from April 2017 through August 2017;
>
> (3) Mr. Gondal was "employed by" The Gem School for two
> weeks in May 2017; and
>
> (4) Mrs. Gondal arguably "finance[d]" The Gem School, in that
> she failed to collect rent from the school for the month of May
> 2017.

52

All of this violative conduct occurred in the past; there is no record evidence that any continues as of the present day. The Court will assess, then, in light of these particular acts,[33] whether Plaintiff has demonstrated that irreparable harm would befall it were Defendants not enjoined.

In its supplemental post-hearing opening brief, Plaintiff articulated *why* it asserts that it will suffer irreparable harm absent an injunction: because (1) "the Gondal's actions" have made it "difficult to refranchise the area because of competition by a former franchisee[;]" (2) the Gondals "st[ole] the goodwill that belongs to GSI"; and (3) there will be "harm [to] the franchise system generally, because absent an enforceable covenant not to compete, there is no incentive for franchisees to remain in (or join) the Goddard system." (D.I. 52 at 11 (citations omitted)) Plaintiff argues that these harms are "irreparable [] and [] an injunction is the appropriate remedy to stop those harms." (*Id.*)

In support, Plaintiff refers to several cases discussed in its pre-hearing opening brief. (*Id.* (citing D.I. 8-2 at 16-23)) In that brief, Plaintiff's primary argument was that there is a general rule set out in cases from this Circuit, which states that irreparable injury necessarily "results when a former franchisee competes against a franchisor in breach of a restrictive covenant contained in the parties' franchise agreements." (D.I. 8-2 at 19 (internal quotation marks and citation omitted).

To be sure, Plaintiff is right that courts in this Circuit regularly hold in franchisor/franchisee cases that "[i]rreparable injury results when a former franchisee competes

---

[33] Thus, for example, because the Court has not found that Plaintiff has a likelihood of success on the merits regarding its assertions that Defendants breached Section 9(B)'s prohibition on sharing confidential information, the Court will not address Plaintiff's arguments that such misconduct demonstrates irreparable harm. (*See* D.I. 8-2 at 22 (citing *Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*, 630 F. Supp. 2d 527, 541 (E.D. Pa. 2009)))

against a franchisor in breach of a restrictive covenant contained in the parties' franchise agreement." *Athlete's Foot Mktg. Assocs. v. Zell Inv., Inc.*, No. CIV.A. 00-186, 2000 WL 426186, at *11 (W.D. Pa. Feb. 17, 2000); *see also Soft Pretzel Franchise Sys., Inc. v. Taralli, Inc.*, Civil Action No. 13-3790, 2013 WL 5525015, at *10 (E.D. Pa. Oct. 4, 2013), *Rita's Water Ice Franchise Co., LLC v. S.A. Smith Enterprises, LLC*, No. CIV.A. 10-4297, 2011 WL 101694, at *8 (E.D. Pa. Jan. 11, 2011). These opinions have tended to explain that in such scenarios, irreparable harm stems from ongoing acts by former franchisees in violation of covenants not to compete.

A good example is found in a passage from *Soft Pretzel Franchise Sys., Inc. v. Taralli, Inc.*, Civil Action No. 13-3790, 2013 WL 5525015 (E.D. Pa. Oct. 4, 2013), a cased cited by Plaintiff, (D.I. 8-2 at 19):

> Here, [the franchisor plaintiff] is irreparably harmed by Defendants' operation of a competing business . . . in violation of the non-compete clause contained in the Franchise Agreement. The purpose of the Franchise Agreement restrictive covenant is to protect [the franchisor] against loss of reputation, damage to its goodwill, and customer confusion, which may result should [D]efendants compete with [the franchisor] after the termination of the Franchise Agreement. Despite Defendants['] contention otherwise, Defendants, as a franchisee, did gain valuable training, knowledge, and experience from [the franchisor]. To permit Defendants to use this knowledge and experience to continue to operate a competing business that serves [the franchisor]'s former and potential customers, even one under a different name with a different color scheme, would irreparably harm [the franchisor]'s goodwill and its ability to effectively compete in Defendant's territory.

*Soft Pretzel Franchise Sys.*, 2013 WL 5525015, at *10. As did the *Soft Pretzel Franchise Sys.* Court, courts often reason that because the franchisor has trained the new franchisee (who may otherwise have had no experience in the business), it would be unjust for the franchisee (absent

54

an injunction) to then be permitted to use the benefits of that very training to serve former and potential customers of the franchisor. *See, e.g.*, *Maaco Enters., Inc. v. Bremner*, No. 98-CV-2727, 1998 WL 669936, at *2, *5 (E.D. Pa. Sept. 29, 1998) ("Maaco invested significant time, money and resources in training and assisting Bremner and SSG in its business system to open, establish and develop their Center as a Maaco franchise."). The *Soft Pretzel Franchise Sys.* Court and other courts have also emphasized that loss of the franchisor's goodwill is a real concern, were the former franchisee permitted to continue to operate a competing business in the relevant area. *See, e.g.*, *Athlete's Foot*, 2000 WL 426186, at *11 ("The covenant-not-to-compete . . . is designed to prevent not only sales that might result from the prohibited competition, but primarily to prevent a disturbance in the relationship between [the franchisor] and its customer base, and the goodwill developed for the stores operated by [the franchisor] and its authorized franchisees[.]"). And courts have also noted that, were the former franchisee not precluded from continuing to run a competing business in the same area, this "could induce other franchisees to violate their franchise agreements and to use the goodwill established by the operation of . . . [their] franchise[s] to establish a competing business." *S.A. Smith Enterprises, LLC*, 2011 WL 101694, at *8; *see also Tantopia*, 918 F. Supp. 2d at 419; *AAMCO Transmissions, Inc. v. Singh*, Civil Action No. 12-2209, 2012 WL 4510928, at *5 (E.D. Pa. Oct. 1, 2012). Each of these concerns, well set out by the above-cited cases, are understandable and persuasive.

That said, the facts of this case are different than those of the cases cited in Plaintiff's pre-hearing opening brief. In the cases cited by Plaintiff, at the time when the preliminary injunction motion was resolved, the former franchisee/defendant had operated the competing business for some time—and was continuing to do so—in violation of prior agreements with the

franchisor/plaintiff. *See Dunkin' Donuts Franchising, LLC v. Claudi A I, LLC*, No. 12-cv-2010, 2014 WL 5343724, at *5, *10 (E.D. Pa. Oct. 20, 2014) (*cited in* D.I. 8-2 at 20); *Soft Pretzel Franchise Sys.*, 2013 WL 5525015, at *10 (*cited in* D.I. 8-2 at 19); *Tantopia*, 918 F. Supp. 2d at 418 (*cited in* D.I. 8-2 at 22); *AAMCO Transmissions, Inc.*, 2012 WL 4510928, at *3–5 (*cited in* D.I. 8-2 at 20); *S.A. Smith Enterprises, LLC*, 2011 WL 101694, at *3, *8 (*cited in* D.I. 8-2 at 20); *Rita's Water Ice Franchise Corp. v. DBI Inv. Corp.*, No.96-306, 1996 WL 165518, at *2, *4–5 (E.D. Pa. Apr. 8, 1996) (*cited in* D.I. 8-2 at 21); *Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 125, 131 (M.D. Pa. 1992) (*cited in* D.I. 8-2 at 21). Thus, in each of these cases, at the point when the court was deciding whether to impose injunctive relief, the former franchisee could have been expected (absent an injunction) to continue to violate the relevant covenant for the foreseeable future. In such a circumstance, the "immediacy" of the irreparable injury to the franchisor/plaintiff (were an injunction not to issue) was obvious.

Here, however, Defendants' likely violations of the FA were not only relatively limited in scope, but they had ceased by the time of the preliminary injunction hearing. There is no evidence that Defendants are likely to re-commence any such activity in the near future.[34] Moreover, unlike in the cases Plaintiff cites, Defendants do not own and are not operating the competing business in question. Mr. Stella and his partner are the owners and operators of The Gem School. And (absent a two-week period where Mr. Gondal worked at The Gem School) the Defendants have never participated in the on-site, day-to-day operation of that business. In other

---

[34] Of course, Defendants can be expected to have further entanglements with The Gem School in the future, in that Yellow Grass continues to lease the school building/property to The Gem School, and the Gondals send their children to The Gem School. But none of that conduct has been shown to amount to a violation of the FA.

words, enjoining Defendants from engaging in the particular FA-violative behavior discussed above is not likely to stop *future* FA violations from occurring, because those violations are not occurring in the present, have not been occurring for some time, and do not seem likely to re-occur in the future. *Cf. Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92–93 (3d Cir. 1992) (vacating a district court's order granting a preliminary injunction when the Court found that "the record shows [defendant] had discontinued its past use of [plaintiff's] process and ha[d] no plans to renew its no-fry chicken project" and where "[plaintiff] has presented no evidence that [defendant] is about to use the technology [plaintiff] seeks to protect"); *see also Paisley Park Enters., Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1049-50 & n.8 (D. Minn. 2017); *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 748 (N.D. Ill. 2010).

Plaintiff's contrary arguments do not persuade the Court to a different conclusion. For example, Plaintiff argues that since Defendants had "no experience operating a preschool prior to their involvement with the Goddard System" and were "given specialized trainings and access to a variety of Goddard System resources" it irreparably harms Plaintiff to "permit the Defendants to use this knowledge and experience to operate The Gem School, servicing former Goddard School clients[.]" (D.I. 8-2 (citing D.I. 8-3 at ¶ 25)) It would be a different question were the Gondals presently using the training and resources that they received from Plaintiff to instruct The Gem School's staff each day on (1) how to run a preschool or (2) how to obtain/retain customers that might otherwise patronize Plaintiff's schools. But they are not. Indeed, the record does not clearly show that the Gondals ever communicated any information about Plaintiff's "specialized trainings [or] resources" to The Gem School in a way that violated the FA.

Plaintiff also argues that in light of The Gem School's operation, GSI: (1) may have a hard time inducing a new franchisee to open a nearby school; (2) may have lost former Goddard School clients to The Gem School; and (3) may otherwise suffer harm to its reputational goodwill. (D.I. 8-2 at 20-21 (citing D.I. 8-3 at ¶¶ 66-67)) In assessing these concerns, it is helpful to ask whether Plaintiff has or will suffer immediate irreparable injury in the form of "loss of control of reputation, loss of trade, and loss of good will." *Opticians Ass'n of Am.*, 920 F.2d at 195. Although courts have applied this standard primarily where there are allegations trademark infringement, *see, e.g., Pappan Enters., Inc. v. Hardee's Food Systems., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998), these factors appear equally relevant to the instant case.

The first factor—loss of control of reputation—does not appear to be at issue, because there is little evidence that Defendants sought to use the Goddard name or marks in a competing business, or that they transferred such material to The Gem School for that purpose. (D.I. 54 at 14-15 ("The Gem School is a distinct, independently operated daycare/preschool with its own trademarks and curriculum."); D.I. 57, ex. C at ¶¶ 4-14) Additionally, Plaintiff has retained control of key domain names and e-mail addresses associated with the Middletown Goddard School (including the e-mail address from which Plaintiff sent the May 4 e-mail to parents of Middletown Goddard School students).[35] (D.I. 18-2, ex. 8)

With regard to the remaining two factors—loss of trade and loss of goodwill—it does appear from the record that Plaintiff suffered some amount of loss, *inter alia*, when customers of the Middletown Goddard School were diverted to The Gem School (due in part to Mr. Gondal's

---

[35]     Both Plaintiff and Intervenors sent direct communications to parents of Middletown Goddard School students stating that The Gem School is not affiliated with Plaintiff. (D.I. 54, ex. B, ex. F)

assistance with the May 1 meeting). Plaintiff did not make it clear in the record as to what was the scope of the loss (i.e., how many customers were diverted), and not all of these families would likely have remained GSI customers going forward. But Plaintiff's point is a fair one: Defendants took certain actions in violation of the FA that helped The Gem School get started, and the resulting fact of The Gem School's existence could harm Plaintiff financially and cause future harm to the goodwill it markets to its other franchisees.

Again, though, the Court must consider that the violations of the covenants not to compete at issue were not as significant as Plaintiff first suggested. They occurred in a cabined time period in the past. And there is no record evidence suggesting that *Defendants* will be involved in any future acts that might cause additional loss of trade or goodwill. This all suggests that—in these particular circumstances, injunctive relief will not serve an important purpose. To the extent that Defendants violated the FA and helped The Gem School get on its feet, and to the extent The Gem School has harmed Plaintiff as a result, then Plaintiff can seek monetary damages from Defendants to address that harm.

### 3. Conclusion

Generally speaking, in franchise law, courts favor enforcement of non-competition provisions and find irreparable harm when former franchisees violate such provisions. But in light of the unique facts of this case, the record does not warrant grant of an injunction against Defendants.

### D. The Remaining Preliminary Injunction Factors

In light of the fact that Plaintiff has not made a showing of immediate irreparable harm, the Court declines to address the remaining preliminary injunction factors. *See Reilly*, 858 F.3d at 179.

### E.     Enjoining Non-Parties Under Rule 65

Before concluding, the Court pauses to address a remaining question relating to Intervenors. As set out above, in assessing this preliminary injunction motion, the Court was required to address the "first two most critical factors[.]" *Reilly*, 858 F.3d at 179 (quotation marks omitted). Those factors, in turn, asked whether Plaintiff had: (1) demonstrated a likelihood of success on the merits as to their allegations that *Defendants* had committed violations of the law; and (2) whether *Defendants'* actions were likely to cause Plaintiff immediate, irreparable injury in the absence of an injunction. The Intervenors (Mr. Stella and The Gem School), of course, are not the Defendants. Despite this, a significant portion of Plaintiff's requested injunctive relief sought an injunction against *Intervenors* and those working with them from "maintain[ing]" or "engag[ing] in" a "Competing School" (i.e., The Gem School). (D.I. 8-5 (Plaintiff seeking injunctive relief against "Defendants, their agents, servants, affiliates, employees and attorneys, and all others in active concert or participation with any of them (including, without limitation, [Intervenors] The Gem School, Robert Stella, and its proprietors, incorporators, officers, directors, agents and members)")) The reason for this was obvious—it is Intervenors and those working with them at The Gem School (not Defendants) who are currently actually running that school.

Above, the Court has explained why, although Plaintiff has demonstrated a likelihood of success on the merits as to certain of its allegations against Defendants, the Court will not enter

an injunction against Defendants at this time. However, below the Court also explains

why—independent of the above-referenced decisions (and even were it to *have* issued an

injunction against Defendants)—it would still not have now enjoined Intervenors from operating

The Gem School.

The relevant portion of the Federal Rules of Civil Procedure is Rule 65, which deals with

"Injunctions and Restraining Orders." Fed. R. Civ. P. 65. Rule 65(a)(1) states that "[t]he court

may issue a preliminary injunction only on notice to the adverse party[.]" Fed. R. Civ. P.

65(a)(1). Rule 65(d)(2), in turn, sets out which persons may be bound by an order granting such

an injunction:

> (2) Persons Bound. The order binds only the following who
> receive actual notice of it by personal service or otherwise:
>
> (A) the parties;
>
> (B) the parties' officers, agents, servants, employees, and attorneys;
> and
>
> (C) other persons who are in active concert or participation with
> anyone described in Rule 65(d)(2)(A) or (B).

Fed. R. Civ. P. 65(d)(2) (emphasis omitted).

Plaintiff makes two different arguments as to why Intervenors (along with The Gem

School's other "proprietors, incorporators, officers, directors, agents and members")[36] fall within

Rule 65(d)(2)'s description of persons or entities whom the Court could now enjoin. First,

Plaintiff argues that a Rule 65(d) injunction can bind a "formal or informal successor-in-interest

---

[36]     For efficiency's sake, hereafter, when the Court makes reference to Plaintiff's
request to enjoin "Intervenors," it is referring to the request to enjoin not only Mr. Stella and The
Gem School, but also the "proprietors, incorporators, officers, directors, agents and members" of
The Gem School.

to a defendant, even if the successor is not a named party[,]" and that The Gem School qualifies as a successor-in-interest to the Gondals. (D.I. 52 at 12-13) Second, Plaintiffs argue that the Intervenors fit the definition of persons "who are in active concert or participation with" the Gondals under the meaning of Rule 65(d)(2)(C). (*Id.*)

With regard to the successor liability theory, Plaintiff did not sufficiently show that it would provide a basis to enjoin The Gem School pursuant to Rule 65(d)(2). *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1351 (Fed. Cir. 1998) (indicating that if a party is enjoined from engaging in certain conduct, and a non-party is later determined to be the enjoined party's successor-in-interest, then pursuant to Rule 65(d), the non-party successor may also be subject to the injunction). For one thing, Plaintiff never articulates *why* Intervenors are, in fact, successors-in-interest to any of Defendants—such as by clearly explaining how existing, relevant case law would support such a conclusion.[37] Moreover, while

---

[37]     The closest the Plaintiff comes in this regard is to cite to the opinion in *Action Mfg. Co. v. Simon Wrecking Co.*, 387 F. Supp. 2d 439 (E.D. Pa. 2005), and to suggest that *Action Mfg.* indicates that an eight-factor "substantial continuity" test should be applied in order to determine whether one entity is a successor-in-interest to another. (D.I. 52 at 13) But in *Action Mfg.*, the United States District Court for the Eastern District of Pennsylvania was not evaluating the question of successor liability in regard to whether an entity was subject to injunctive relief pursuant to Rule 65. Instead, it was assessing successor liability principles in the context of a claim brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"). *Action Mfg.* 387 F. Supp. 2d at 440-41. And even in that (quite different) context, the *Action Mfg.* Court decided *not* to apply the eight-factor "substantial continuity" test that is offered here by Plaintiff. *Id.* at 447. To the contrary, the *Action Mfg.* Court found that the eight-factor test amounted to an expansion of one of the traditional rules of successor liability, and determined that instead, it should employ a narrower test in the CERCLA context, one drawn from federal common law. *Id.* at 447-53. Moreover, Defendants have suggested that if it is appropriate to look to successor liability principles in this context, then Pennsylvania law should govern, and an application of Pennsylvania law would result in a decision that The Gem School would *not* be deemed a successor-in-interest to Defendants. (D.I. 53 at 14 (citing *Fizzano Bros. Concrete Prods., Inc. v. XLN, Inc.*, 615 Pa. 242, 273 (2012))); *see also Marshak v. Treadwell*, 595 F.3d 478, 490 (3d Cir. 2009) (reviewing the

a successor-in-interest non-party may be able to be bound by an injunction that has already issued against a party, *see, e.g., Jackson Hewitt Inc. v. H.E.A.T. Enterprises, LLC*, No. 10-CV-5108, 2011 WL 6347883, at *3 (D.N.J. Dec. 15, 2011); *NovaSeptum AB v. Amesil, Inc.*, Civil Action No. 05-CV-5175, 2010 WL 5620906, at *3 (D.N.J. Dec. 29, 2010), it is not clear to the Court that a successor-in-interest non-party may, in the first instance, be enjoined *instead of* a party.

This leaves Plaintiff's argument that Intervenors "are in active concert or participation with" the Gondals under the meaning of Rule 65(d)(2)(C).[38] For the reasons set forth below, however, the Court determines that could not enjoin the non-party Intervenors on this ground, either.

The Court has not come across Third Circuit case law directly addressing the question of whether a district court can *enjoin* a non-party from engaging in certain conduct pursuant to Rule 65. However, it has found relevant and helpful guidance on this question from two decisions from the United States Court of Appeals for the Federal Circuit, which were issued in two related cases: *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390 (Fed. Cir.

---

district court's application of an eight-factor test under *New Jersey law* to determine whether a party was a successor-in-interest to an enjoined party).

In the end, Plaintiff's failure to better articulate what the appropriate legal standard should be for determining whether The Gem School is a successor-in-interest is another reason why its argument here should fail.

[38] By the time of Plaintiff's post-hearing reply brief, it appears that it had largely given up on the idea that Intervenors could be enjoined pursuant to Rule 65(d)(2) under a successor liability theory; instead, it seemed now to be mainly (if not entirely) pursuing the theory that such an injunction was appropriate due to the "active concert or participation" prong of Rule 65(d)(2)(C). Indeed, the relevant portion of Plaintiff's reply brief was simply titled "Enjoining All is Proper as There is Active Participation and Concert." (D.I. 58 at 7 (emphasis omitted))

1996) ("*Additive Controls I*") and *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345 (Fed. Cir. 1998) ("*Additive Controls II*").

In *Additive Controls I*, the Federal Circuit noted the longstanding "general rule that a court may not enter an injunction against a person who has not been made a party to the case before it[,]" and explained that, as a result, the portion of a district court's injunction that bound a non-party to the litigation before it "is inconsistent with the general principle that a non-party to an action may not be enjoined in that action." 96 F.3d at 1394-95 (citations omitted). The *Additive Controls I* Court further stated that "the prohibition against entering an injunction against non-parties does not mean that non-parties may not be held in contempt of court for violating injunctions directed at others" as "[c]ourts have carefully distinguished between entering an injunction against a non-party, which is forbidden, and holding a non-party in contempt for aiding and abetting in the violation of an injunction that has been entered against a party, which is permitted." *Id.* at 1395 (citing *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930)). The *Additive Controls I* Court did acknowledge Rule 65(d)(2)(C)'s reference to an injunctive order that may bind persons "in active concert or participation" with a party. But it explained that this language was simply meant to codify the common law rules set out above—i.e., to indicate that "those who act in concert with an enjoined party may be held in contempt, but only for assisting the [already] enjoined party in violating the injunction." *Id.* (citing *Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 903 F.2d 1568, 1580-81 (Fed. Cir. 1990)); *see also Aevoe Corp. v. AE Tech. Co., Ltd.*, 727 F.3d 1375, 1384 (Fed. Cir. 2013) (noting that once an injunction issues, then a "party who acts in concert with an enjoined party . . . may be subject to the strictures of an injunction."); *Alemite*

*Mfg. Corp.*, 42 F.2d at 832 ("We agree that a person who knowingly assists a defendant in violating an injunction subjects himself to . . . proceedings for contempt. This is well settled law."); *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, Case No. 11-cv-04494-WHO, 2013 WL 4604746, at *4-5 (N.D. Cal. Aug. 28, 2013); *James v. Scribner*, No. CV 07-880-TUC-RCC, 2010 WL 3942844, at *2 (E.D. Cal. Oct. 4, 2010); *Serrano v. Folino*, Civil Action No. 05-1118, 2007 WL 906184, at *2 (W.D. Pa. Mar. 21, 2007).

In *Additive Controls II*, the Federal Circuit again reiterated the key points addressed in its prior decision:

> In an earlier appeal in this case, we addressed the basic rules concerning enjoining non-parties. . . . This appeal, by contrast, involves holding non-parties in contempt of an injunction. The two are quite different. As a general matter, a court may not enjoin a non-party that has not appeared before it to have its rights legally adjudicated. . . . Non-parties may be held in contempt, however, if they either abet the defendant, or are legally identified with him. . . . That common-law principle is reflected in the text of Rule 65(d)[.]

154 F.3d at 1351 (internal quotation marks, citations and brackets omitted).

In the absence of clear direction from the Third Circuit on this question, the Court finds that the Federal Circuit's guidance in these cases is persuasive.[39] And the cases from this Circuit cited in Plaintiff's briefing are not to the contrary. Instead, many of those cases involved a situation where an injunction was issued against defendant(s), and then later, a contempt proceeding was brought as to non-parties said to have acted in active concert and participation

---

[39] Indeed, one of the cases cited by Plaintiff—*NovaSeptum AB v. Amesil, Inc.*, Civil Action No. 05-CV-5175, 2010 WL 5620906 (D.N.J. Dec. 29, 2010), (D.I. 52 at 12)—relies upon *Additive Controls I* for helpful guidance in interpreting Rule 65(d)(2). *NovaSeptum*, 2010 WL 5620906 at *3.

with those enjoined parties.[40] *See Marshak v. Treadwell*, 595 F.3d 478, 486-87 (3d Cir. 2009) (*cited* in D.I. 52 at 12); *Max's Seafood Café ex. Rel. Lou-Ann, Inc v. Quinteros*, 176 F.3d 669, 674 (3d Cir. 1999) (*cited in* D.I. 52 at 12); *Jackson Hewitt Inc.*, 2011 WL 6347883, at *3 (*cited in* D.I. 52 at 12); *NovaSeptum AB*, 2010 WL 5620906, at *3 (*cited in* D.I. 52 at 12).

Thus, in light of the case law set out above, even had the Court determined to enjoin Defendants pursuant to the instant motion, it would not have been permitted to now have enjoined non-party Intervenors from doing anything. At most, were Intervenors to have engaged in future "active concert and participation" with Defendants that violated any of the terms of any issued injunction, then Intervenors could then have been subject to a contempt proceeding and, ultimately, a contempt finding. *See, e.g., Power-One, Inc. v. Artesyn Techs., Inc.*, Civil Action No. 2:05-CV-463, 2008 WL 1746636, at *2 (E.D. Tex. Apr. 11, 2008).

---

[40] Plaintiffs also identify a number of cases, (D.I. 52 at 14), in which district courts have enjoined third-party defendants who were not signatories to a restrictive covenant, after finding that the plaintiff had demonstrated a likelihood of success on the merits in showing a breach of the covenant (due to the acts of defendants who were signatories to the covenant and/or due to the acts of the third-party defendants): *The Maids Int'l, Inc. v. Maids on Call, LLC*, 8:17CV208, 2017 WL 4277146 (D. Neb. Sept. 25, 2017); *Tantopia*, 918 F. Supp. 2d 407; *Bonus of Am., Inc. v. Angel Falls Servs., L.L.C.*, Civil No. 10-2111 (DSD/FLN), 2010 WL 2734218 (D. Minn. July 6, 2010); *Tanfran, Inc. v. Aron Alan, LLC*, No. 1:06-CV-830, 2007 WL 1796235 (W.D. Mich. June 20, 2007). For example, one court held that "[i]t is well-established that a non-covenantor who benefits from the covenantor's relationship with a competing business must abide by the same restrictive covenant agreed to by the covenantor." *Tantopia*, 918 F. Supp. 2d at 416-17. In light of the teachings in the Rule 65 case law set out above, and in light of the procedural differences (e.g., Intervenors are not parties to the litigations) and the factual differences between those cases and the instant case, the cited cases do not affect the Court's decision here.

66

For all of these reasons, the Court separately declines to enjoin Intervenors from engaging in specific conduct, including from operating The Gem School.[41]

## IV. CONCLUSION

For the reasons stated above, Plaintiff's motion is DENIED.

An appropriate order shall issue.

---

[41] In light of its decision here, the Court need not address Intervenors' argument that an injunction requiring it to close The Gem School would be unjust, in that it would displace 104 children and their families from an educational environment during the school year (and would result in the immediate unemployment of the approximately 30 staff members who work at The Gem School). Those facts, however, certainly would have been at the forefront of the Court's mind had an injunction against Intervenors been more of a possibility.